**Durlyn EDDMONDS, Petitioner–Appellant,**

v.

**Howard PETERS, III, Respondent–Appellee.**

No. 95–2142.

United States Court of Appeals, Seventh Circuit.

Argued March 12, 1996.

Decided Aug. 23, 1996.

Richard E. Cunningham (argued), Anne E. Carlson, Chicago, IL, for Petitioner–Appellant.

Rita M. Novak, Terence Madsen, Office of Atty. Gen., Chicago, IL, Michael A. Hurst, Office of Atty. Gen., Crim. Appeals Div., Chicago, IL, Marie Quinlivan Czech (argued), Office of State's Atty. of Cook County, Crim. Appeals Div., Chicago, IL, for Respondent–Appellee.

Before FLAUM, MANION, and ROVNER, Circuit Judges.

MANION, Circuit Judge.

Durlyn Eddmonds was found guilty of the deviate sexual assault and murder of a nine-year-old boy and sentenced to death. After his conviction and sentence were upheld on appeal and in state post-conviction proceedings, Eddmonds petitioned the district court for a writ of habeas corpus alleging he was denied the effective assistance of counsel and due process at trial and sentencing and that

the Illinois death penalty statute is unconstitutional. The district court denied the petition. Eddmonds appeals only the ruling on his ineffective assistance of counsel claims. We affirm.

### I.

The Illinois Supreme Court gave a detailed account of the evidence adduced at trial in *People v. Eddmonds*, 101 Ill.2d 44, 77 Ill.Dec. 724, 461 N.E.2d 347 (1984) (*"Eddmonds I"*). The following are excerpts from that opinion, supplemented at points with additional details from the record:[1]

> In a statement taken by an assistant State's attorney and transcribed by a court reporter, defendant, age, 25, said that in the early morning of October 27, 1977, he called down to the alley below his apartment and asked Richard Miller, age 9, to come upstairs. He had seen the boy with two men, and when Richard came upstairs defendant noted that the boy was bleeding from his rectum. Defendant told Richard that he wanted to have anal intercourse with him as the other men had just done.

*Id.*, 77 Ill.Dec. at 727, 461 N.E.2d at 350. Eddmonds told Richard to undress. Richard had blood and feces on him from the prior rape. Eddmonds cleaned him with a wet cloth and toilet paper. Eddmonds put a sheet of plastic on the bed, laid Richard on it, and began to sodomize him.

> During the act of intercourse the boy started to cry and asked defendant to stop because he was hurting him. In an effort to silence Richard, defendant pushed the boy's body face down into a pillow. Defendant later told the police that he did not want the boy to awaken his grandmother in the next room. During the act of intercourse, Richard stopped breathing. When defendant completed the act, he noticed "that the boy wasn't breathing properly." Defendant tried to revive him and, failing that, looked for a place to conceal the body. He put the body in a garbage dumpster in the alley below his apartment and threw the boy's clothes and the mate-

rials he had used in cleaning him up into a yellow garbage bag. Defendant scattered the bag and its contents in a nearby alley.

> A latent fingerprint examiner for the Chicago police department testified that there were in excess of 12 points of comparison between the impressions found on a newspaper lying near the yellow garbage bag and defendant's right palm print. It was his opinion that the print found on the newspaper was the same as defendant's right palm print. There was also testimony, from a microanalyst from the Chicago police department, that the garbage bag found in the alley and the bags retrieved from the defendant's apartment produced similar results when subjected to scientific analysis. The analyst also testified that a sock found in the bag had the same fiber content as one found on the landing of the porch directly in front of defendant's apartment and above the garbage dumpster. Dr. Robert Stein, chief medical examiner of Cook County, testified that he performed an autopsy and that the "cause of [Richard Miller's] death was suffocation in association with contusions and lacerations of the anus."

*Eddmonds I,* 77 Ill.Dec. at 727, 461 N.E.2d at 350.

Notwithstanding his recorded confession, at trial Eddmonds testified he did not rape Richard Miller:

> Defendant testified that a friend of his, Jerome Williams, had come to his apartment in a nervous state. After using the bathroom to clean up, Williams asked if he could use some plastic bags which were lying on defendant's bed. He asked defendant to obtain some heroin and then left the apartment. Defendant also left the apartment, purchased a half ounce of heroin, and gave it to Williams. Williams returned to defendant's apartment shortly after midnight. He was carrying a shopping bag which he took into defendant's bedroom and left there. Both men left the apartment. Defendant returned home at approximately 2:15 a.m. and went to sleep.

---

1. Pursuant to 28 U.S.C. § 2254(d), absent evidence in the record to the contrary, federal courts are to consider presumptively correct the factual findings of a state court of competent jurisdiction. *Kavanagh v. Berge*, 73 F.3d 733, 735 (7th Cir.1996).

When he awoke the next morning he discovered the shopping bag contained a child's clothing, shoes and a yellow plastic bag. His grandmother then told him about the body of the boy which had been found in the alley. Knowing that there was a child's clothing in the shopping bag and that Williams had been arrested for molesting children, defendant quickly left with the shopping bag. He met Williams, and Williams said he would get rid of the bag. They walked to an alley, and Williams dumped the bag.

Defendant also related a conversation with Williams in which Williams told of having sex with the dead boy and then drowning him in a bathtub so that he could not carry out his threat to tell his mother. He also testified to an episode in which Williams had prepared two syringes of heroin, one for himself and one for defendant. He noted that the one intended for him was darker and, while Williams was otherwise engaged, he switched syringes. Thereafter, Williams "shot the heroin" and in a short period of time began to shake. Williams died the following day, apparently of an overdose of heroin.

Defendant testified that the statements he made concerning the sexual assault and the death of the boy were false and were made because the police "would not let him leave and told him what to say." He denied each of the charges against him.

*Id.* at 727–28, 461 N.E.2d at 350–51.

Eddmonds waived his right to a jury trial. After a bench trial before the Honorable Judge John Crowley of the Circuit Court of Cook County, Illinois, Eddmonds was found guilty of deviate sexual assault and murder. Pursuant to section 9–1(d) of the Criminal Code of 1961 (Ill.Rev.Stat.1979, ch. 38, par. 9–1(d); now 720 ILCS 5/9–1(d)), the State requested a death penalty hearing and Eddmonds waived his right to be sentenced by a jury. The court made initial findings that Eddmonds was over 18, that the murder occurred during the commission of the felony of deviate sexual assault, and that Eddmonds was eligible for the death penalty under § 9–1(b)(6). The court then heard evidence of mitigation and aggravation. *Eddmonds I,* 77 Ill.Dec. at 728, 461 N.E.2d at 351.

In aggravation, the State presented testimony that Eddmonds had committed four other rapes, three resulting in convictions. In mitigation the defense presented Dr. Robert Reifman, director of the Psychiatric Institute of the Circuit Court of Cook County. Dr. Reifman testified that, based on his examination of Eddmonds in December 1977 to determine fitness for trial, he had concluded that Eddmonds suffered from schizophrenia, undifferentiated type, which in his opinion caused him to be out of contact with reality and thus unfit for trial. His diagnosis was based on Eddmonds' report of hearing voices and his emotional withdrawal, lethargy, depression, and inappropriate smiling. During a lengthy cross-examination, Dr. Reifman stated he was unable to render a definitive opinion whether, at the time the offense was committed, Eddmonds was under the influence of an extreme mental or emotional disturbance. *Eddmonds I,* 77 Ill.Dec. at 728, 461 N.E.2d at 351. The court also reviewed the presentence investigation but found no mitigating factors sufficient to outweigh those in aggravation. *Id.* The court then sentenced Eddmonds to death for the murder and to 40 to 80 years' incarceration for the deviate sexual assault. *Id.*

On direct appeal the Illinois Supreme Court affirmed the convictions and sentences. *Id.* at 737, 461 N.E.2d at 360. The United States Supreme Court denied Eddmonds' petition for writ of certiorari. *Eddmonds v. Illinois,* 469 U.S. 894, 105 S.Ct. 271, 83 L.Ed.2d 207 (1984). On May 28, 1985, Eddmonds filed a petition for post-conviction relief alleging he was denied his right to competent counsel because his attorney (1) failed to investigate his fitness to stand trial and failed to request a fitness hearing, and (2) failed to investigate and present mitigating evidence at sentencing. *People v. Eddmonds,* 143 Ill.2d 501, 161 Ill.Dec. 306, 578 N.E.2d 952, 955 (1991) (*"Eddmonds II"*). The State moved to dismiss the petition on the ground that the fitness issue had been resolved on direct appeal and that Eddmonds' attorney was not ineffective at sentencing. *Id.* Following an evidentiary hear-

ing, the judge at first denied relief but later vacated the sentence and ordered a hearing to determine whether Eddmonds was fit at the capital sentencing hearing. *Id.* On appeal, the Illinois Supreme Court reinstated the death sentence, holding that Eddmonds was not deprived of his right to competent counsel or to a fair post-conviction proceeding. *Id.*, 161 Ill.Dec. at 323, 578 N.E.2d at 969.

On August 24, 1992, Eddmonds petitioned the district court for a writ of habeas corpus, again alleging that (1) he was denied the effective assistance of counsel when his trial attorney failed to request a fitness hearing prior to trial; (2) he was denied due process because his fitness was not adjudicated; (3) counsel was ineffective at sentencing in his presentation of evidence and argument in mitigation; (4) he was denied due process at sentencing because of the admission of testimony calculated to appeal to racial prejudice; (5) he was denied a full and fair post-conviction hearing by the court's limitation of witness testimony; and (6) the Illinois death penalty statute is unconstitutional. After extensive evidentiary hearings, the district court denied the writ.

## II.

Eddmonds raises two issues on appeal. First, he claims his trial counsel's failure to request a competency hearing deprived him of the effective assistance of counsel. Second, he claims that counsel's failure during sentencing to adequately investigate and present available mitigating evidence of his mental problems combined with counsel's brief closing argument deprived him of the effective assistance of counsel at his capital sentencing hearing.

 The Sixth Amendment right to counsel is a right with a function: It "exists 'in order to protect the fundamental right to a fair trial.'" *Lockhart v. Fretwell,* 506 U.S. 364, 368, 113 S.Ct. 838, 842, 122 L.Ed.2d 180 (1993) (quoting *Strickland v. Washington,* 466 U.S. 668, 684, 104 S.Ct. 2052, 2062, 80 L.Ed.2d 674 (1984)). "Thus 'the right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive

a fair trial.'" *Fretwell,* 506 U.S. at 369, 113 S.Ct. at 842 (quoting *U.S. v. Cronic,* 466 U.S. 648, 658, 104 S.Ct. 2039, 2046, 80 L.Ed.2d 657 (1984)). The Supreme Court has "identified two components to any ineffective assistance claim: (1) deficient performance and (2) prejudice." *Fretwell,* 506 U.S. at 369, 113 S.Ct. at 842 (emphasis added). Both components are necessary; the lack of either is fatal. *Strickland,* 466 U.S. at 697, 104 S.Ct. at 2069 (court need review only one prong of test in disposing of ineffective assistance claim). Regarding performance, "[j]udicial scrutiny of counsel's performance must be highly deferential." *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065. Only those "who can prove under *Strickland* that they have been denied a fair trial by the *gross incompetence* of their attorneys will be granted the writ." *Kimmelman v. Morrison,* 477 U.S. 365, 382, 106 S.Ct. 2574, 2586–87, 91 L.Ed.2d 305 (1986) (emphasis added). "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064. As for prejudice, defendant must show that counsel's unprofessional errors "undermin[ed] confidence in the outcome." *Id.* at 694, 104 S.Ct. at 2068. Prejudice in the *Strickland* sense refers to "unprofessional errors" so egregious "that the trial was rendered unfair and the verdict rendered suspect." *Morrison,* 477 U.S. at 374, 106 S.Ct. at 2582. In evaluating the impact of attorney errors on the verdict, we must keep in mind that the "ultimate objective [of our legal system is] that the guilty be convicted and the innocent go free." *Evitts v. Lucey,* 469 U.S. 387, 394, 105 S.Ct. 830, 835, 83 L.Ed.2d 821 (1985) (quoting *Herring v. New York,* 422 U.S. 853, 862, 95 S.Ct. 2550, 2555, 45 L.Ed.2d 593 (1975)).

### A. Competency To Stand Trial

 Eddmonds argues that his trial counsel was incompetent for failing to request a fitness hearing, and that if a hearing had been held, there is a reasonable probability he would have been found incompetent. There is no question that Eddmonds is a disturbed man, and has been so for some

time; anyone who has committed four other rapes and who rapes and murders a young boy is twisted. But that doesn't necessarily mean he was unfit for trial. If it did then no one guilty of heinous crimes could be tried. Fitness for trial is a much narrower concept than moral or social wellness.

■■■■ A defendant has a due process right not to be tried if he is unable to assist in his own defense. *Pate v. Robinson,* 383 U.S. 375, 378, 86 S.Ct. 836, 838, 15 L.Ed.2d 815 (1966). "[T]he prohibition [against trying the mentally incompetent] is fundamental to an adversary system of justice." *Drope v. Missouri,* 420 U.S. 162, 172, 95 S.Ct. 896, 904, 43 L.Ed.2d 103 (1975). *Drope* notes that "[s]ome have viewed th[is] common law prohibition 'as a by-product of the ban against trials *in absentia*; the mentally incompetent defendant, though physically present in the courtroom, is in reality afforded no opportunity to defend himself.'" *Id.* at 171, 95 S.Ct. at 903 (quoting Foote, A Comment on Pre–Trial Commitment of Criminal Defendants, 108 U.Pa.L.Rev. 832, 834 (1960)). There is an important distinction here. The Constitution forbids trial of one who, for whatever reason, is unfit to assist in his own defense because our adversarial system of justice depends on vigorous defenses. The Constitution does not necessarily forbid trial of the mentally ill. "Not every manifestation of mental illness demonstrates incompetence to stand trial; rather the evidence must indicate a present inability to assist counsel or understand the charges." *United States ex rel. Foster v. DeRobertis,* 741 F.2d 1007, 1012 (7th Cir.1984); *Galowski v. Berge,* 78 F.3d 1176, 1182 (7th Cir.1996); *Medina v. Singletary,* 59 F.3d 1095, 1107 (11th Cir.1995) ("[N]either low intelligence, mental deficiency, nor bizarre, volatile, and irrational behavior can be equated with mental incompetence to stand trial.").

■■■■ The issue is not mental illness, but whether the defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States,* 362 U.S. 402, 402, 80 S.Ct. 788, 789, 4 L.Ed.2d 824 (1960); *Drope,* 420 U.S. at 172, 95 S.Ct. at 904; *DeRobertis,* 741 F.2d at 1012. If so, then regardless of mental illness a defendant will be deemed competent to stand trial. Because capacity to assist in one's defense is the main concern, if fitness for trial is being challenged post-trial "[e]vidence of a defendant's behavior and demeanor at trial are relevant to the ultimate decision of competency to stand trial." *United States v. Prince,* 938 F.2d 1092, 1094 (10th Cir.1991); *cf. Pate v. Robinson,* 383 U.S. 375, 386, 86 S.Ct. 836, 842, 15 L.Ed.2d 815 (1966) (demeanor at trial relevant to sanity determination, though "it cannot be relied upon to dispense with a hearing on that very issue"). After the fact, the fitness determination should be based on "evidence of [defendant's] irrational behavior, his demeanor at trial, and any prior medical opinion." *Drope,* 420 U.S. at 180, 95 S.Ct. at 908; *DeRobertis,* 741 F.2d at 1011.

With these principles in mind, we turn to the evidence of fitness which existed prior to trial, when the fitness hearing allegedly should have been held. Eddmonds was charged with murder and deviate sexual assault on November 3, 1977. His assigned counsel, assistant public defender Todd Musburger, thought Eddmonds incapable of assisting in his defense and requested a psychiatric examination. On December 5, 1977, Eddmonds was examined by psychiatrist Robert Reifman and psychologist Michael Rabin of the Psychiatric Institute of the Circuit Court of Cook County. Dr. Reifman concluded that Eddmonds was unable to assist in his own defense. This conclusion was in part based on Eddmonds' statement that he would prefer the electric chair if found guilty. Dr. Rabin also questioned Eddmonds' ability to cooperate with his attorney due to his mental illness, but found that Eddmonds was aware of court proceedings. Dr. Reifman referred Eddmonds to the Illinois State Psychiatric Institute (ISPI) for a two-week evaluation and the court ordered a fitness hearing to be held on January 12, 1978. At the outset, Dr. Jewett Goldsmith found Eddmonds to be chronically and severely depressed, feeling there was nothing he could do to defend himself against the

death penalty. In an initial evaluation, Dr. Goldsmith thought Eddmonds unfit for trial because of his depression and his lack of interest in defending himself against a possible capital charge. Dr. Goldsmith reported that Eddmonds considered himself "capable of sitting in a courtroom and listening to what goes on" and that he did "not consider himself in need of mental treatment." After the two-week evaluation, during which time Eddmonds ate and slept well, socialized with the other patients, and exhibited no bizarre or unusual behavior, Dr. Goldsmith had changed his mind. On January 10, 1978, in his final report detailing the results of his inquiry and submitted by defense counsel on the date set for the fitness hearing, Dr. Goldsmith diagnosed Eddmonds with chronic depression, determined there was no evidence of psychotic behavior, and concluded Eddmonds was fit to stand trial and "not in need of mental treatment at this time." Noting the conflicting opinions among the doctors, defense counsel petitioned the court for another mental examination by a private psychiatrist.

On January 17, 1978, Eddmonds was placed on Thorazine, an anti-psychotic, psychotropic medication, by a psychiatrist at Cook County Jail. He stayed on Thorazine approximately six months. On January 25, 1978, Dr. Albert Stipes, a private psychiatrist, reported that although Eddmonds understood the murder charge, he did not understand the other charges, did not fully understand the proceedings against him, and felt hopeless about his defense. He concluded stating, "I do not believe [Eddmonds] could cooperate with his attorney in defending himself because of his hopelessness." Dr. Stipes was unable to make a determination as to Eddmonds' state of mind at the time of the crime.

In preparation for his testimony at the scheduled fitness hearing, Dr. Reifman, the author of the first psychiatric report stating that Eddmonds was unfit, obtained court permission to reexamine Eddmonds. On June 6, 1978, Dr. Reifman reexamined Eddmonds and concluded that he was "fit to stand trial with medication. He understands the nature of the charge, the purpose of the proceedings and is able to assist counsel in his own defense." That day Dr. Rabin also reexamined him and found that Eddmonds understood court procedures and had a "good orientation." Still, Dr. Rabin thought Eddmonds' mental illness made his ability to cooperate with counsel "questionable." On July 14, 1978, Eddmonds was examined by Dr. Gerson Kaplan, a psychiatrist at the Psychiatric Institute for the Circuit Court of Cook County, and again by Dr. Rabin. Though noting Eddmonds' depression and persisting in his diagnosis of schizophrenia, Dr. Rabin concluded he was able to cooperate with counsel and was fit to stand trial. Dr. Kaplan had been asked to evaluate Eddmonds' sanity at the time of the crime. He was unable to render an opinion on this because Eddmonds denied committing the crime and denied remembering his activities around the time of the crime. However, Dr. Kaplan found that Eddmonds was fit for trial because he understood the charges against him and was able to cooperate in his own defense. On approximately July 17, 1978, Eddmonds stopped taking Thorazine.

On April 10, 1979, Eddmonds was again examined by Drs. Kaplan and Rabin. Dr. Kaplan again reported that Eddmonds was fit to stand trial and made no mention of any need for medication. Dr. Kaplan stated that Eddmonds "came across as being quite manipulative and trying to impress this examiner with how depressed and sick he is." Dr. Kaplan questioned whether Eddmonds was really hearing voices because while Eddmonds had allegedly heard voices for years he could not give even one example of what the voices had said. He changed his previous diagnosis of schizophrenia to antisocial personality disorder with depressive features. Dr. Kaplan also doubted that Eddmonds really felt so hopeless about his trial since he was "very quick" to point out that his confession could not be valid because he was high on drugs when he gave it and because he denied any memory of the crime. For his part, Dr. Rabin maintained his earlier diagnosis of schizophrenia, but concluded that Eddmonds was "minimally fit for trial."

On May 2, 1979, Eddmonds filed a pro se petition for substitution of counsel. As a

result Musburger withdrew as Eddmonds' counsel and, in accordance with Eddmonds' wishes for an attorney not from the public defender's office, private defense counsel Thomas McGinnis took on the case. On September 26, 1979, Dr. Rabin again interviewed Eddmonds. He found that Eddmonds "is manipulative, seeking to gather sympathy for himself by telling of his woes in jail.... He criticizes the confession, seeking minor flaws and inconsistencies to prove it false.... He claims to hear voices, but this is seen as an attempt to malinger." Based on his observations, Dr. Rabin abandoned his diagnosis of schizophrenia—as Dr. Kaplan had earlier—and concluded that Eddmonds was suffering from antisocial personality with depression. He also concluded that Eddmonds was fit for trial: "He is aware of the nature of the charges and proceedings pending against him and is capable of assisting counsel in his defense." On September 28, 1979, Dr. Kaplan again examined Eddmonds pursuant to a court order and concluded he was legally sane at the time of the crime.

On November 26, 1979, Dr. Stipes reexamined Eddmonds and reported he was in much better contact with reality than at the time of his last examination. Dr. Stipes concluded Eddmonds was sane at the time of the murder. He did not render an opinion on fitness to stand trial at this time. However, Dr. Stipes later testified that, at the time of this examination, Eddmonds was able to cooperate with counsel and to understand the nature of the charges against him.

In sum, prior to trial Eddmonds was found fit for trial five times: (1) on January 10, 1978, Dr. Goldsmith found Eddmonds fit after a two-week evaluation; (2) on June 6, 1978, Dr. Reifman found Eddmonds fit with medication; (3) on July 14, 1978, Dr. Rabin found him fit, though depressed and schizophrenic; (4) on July 14, 1978, Dr. Kaplan found him cognizant of the charges and able to cooperate with counsel; (5) on April 10, 1979, Dr. Kaplan again found Eddmonds fit; (6) on April 10, 1979, Dr. Rabin found him minimally fit; and (7) on September 26, 1979, Dr. Rabin found him fit. Therefore, the last finding of fitness before trial was on September 26, 1979. The only findings of unfitness

were on December 5, 1977 (Dr. Reifman) and January 25, 1978 (Dr. Stipes), more than two years before trial. Dr. Reifman changed his opinion in June 1978 when he found petitioner to be "fit with medication." Dr. Stipes later testified that at the time of his final examination, on November 26, 1979, Eddmonds was fit for trial.

Although a fitness hearing was ordered on December 19, 1977 by Judge Joseph Gordon and again on February 8, 1978 by Judge James Strunck, the hearing was repeatedly continued and ultimately never held. The problem seems to have been due to new defense counsel and a new trial judge. When Eddmonds' new counsel, McGinnis, took over the case in May 1979, he moved for a psychiatric examination to determine Eddmonds' sanity at the time of the offense, but he never requested a fitness hearing because he assumed one had already been held. In March 1980, the case was transferred from Judge Strunck, who was aware of the fitness concerns, to Judge Crowley who apparently was not. The defendant was tried before Judge Crowley in June 1980 without the benefit of a fitness hearing.

■■■ Assuming for the sake of argument that counsel's failure to request a fitness hearing was constitutional incompetence per *Strickland*, Eddmonds suffered no prejudice as a result. Eddmonds argues there was a bona fide doubt of his fitness and that therefore he was severely prejudiced when his attorney failed to request a fitness hearing. This argument assumes that *Strickland* prejudice can arise solely because a deserved fitness hearing was not held. That is incorrect. A defendant has a right to a fitness hearing under some circumstances. We have held that where the trial judge has a "substantial reason to doubt the defendant's fitness," due process obligates the trial judge *sua sponte* to order a competency hearing. *Phillips v. Lane,* 787 F.2d 208, 216 (7th Cir.), cert. denied, 479 U.S. 873, 107 S.Ct. 249, 93 L.Ed.2d 173 (1986); *DeRobertis,* 741 F.2d at 1011. Illinois law entitles a defendant to a fitness hearing where there is a bona fide doubt of fitness. Ill.Rev.Stat.1979, ch. 38, para. 104–11(a) (now 725 ILCS 5/104–11(a)). But a fitness hearing is not an end in itself.

Its function is to ensure that the defendant is competent to assist in his own defense at trial. Thus, the improper denial of a fitness hearing can be harmless under *Strickland. Galowski*, 78 F.3d at 1181 ("[I]mproper procedures utilized at a competency hearing may be deemed harmless if 'there is no reasonable possibility that proper procedures would have produced a finding of incompetency.'") (quoting *United States ex rel. Lewis v. Lane*, 822 F.2d 703, 706 (7th Cir.1987)). The question is not whether there should have been a fitness hearing, but whether Eddmonds was fit to stand trial—whether he was sufficiently able "to consult with his lawyer with a reasonable degree of rational understanding—and whether he ha[d] a rational as well as factual understanding of the proceedings against him." *Dusky*, 362 U.S. at 402, 80 S.Ct. at 789; *Drope*, 420 U.S. at 172, 95 S.Ct. at 904. Only if there is a reasonable probability that Eddmonds was not fit, calling into question the integrity of the adversarial process, will "confidence in the outcome" of the trial be deemed undermined for purposes of an ineffective assistance claim under *Strickland.* 466 U.S. at 694, 104 S.Ct. at 2067.

We agree with the district court that Eddmonds was fit for trial, and "with room to spare." *Galowski*, 78 F.3d at 1181. Every evaluation in the two and a half years prior to the trial in June 1980 found Eddmonds fit. Even the initial doubters came to view him as fit. Dr. Reifman found Eddmonds unfit in December 1977 but changed his opinion in June 1978 to "fit with medication." Dr. Rabin questioned Eddmonds' fitness in December 1977 and June 1978 but found him fit in July 1978 and April and September 1979. And Dr. Stipes, who found Eddmonds unfit in January 1978, has indicated Eddmonds was fit in September 1979. It is not evident that failure to request a fitness hearing in the face of such evidence is "gross incom-

petence" under *Strickland. See Kimmelman*, 477 U.S. at 382, 106 S.Ct. at 2587. But if it is, as we assume arguendo, it was hardly prejudicial. Given the evidence that would have been before the court at a fitness hearing, we have no doubt Eddmonds would have been found competent. The evidence indicates Eddmonds was fit for trial.[2]

Since we are considering Eddmonds' capacity to assist in his defense, *Dusky*, 362 U.S. at 402, 80 S.Ct. at 788, whether he in fact assisted in his defense at trial, while not dispositive, is highly relevant. *Drope*, 420 U.S. at 180, 95 S.Ct. at 908; *Pate*, 383 U.S. at 386, 86 S.Ct. at 842; *Prince*, 938 F.2d at 1094; *DeRobertis*, 741 F.2d at 1011. Here Eddmonds' arguments fail. The record indicates Eddmonds was sufficiently able to participate in his own defense to ensure the integrity of the adversarial process. When the trial judge asked if he understood what a jury trial is, for instance, Eddmonds responded that it was where "twelve people" "decide." The judge repeatedly advised Eddmonds in detail about the advantages of a jury trial (twelve average citizens, only one needed to prevent conviction, etc.) versus a bench trial (one man would decide), inquiring frequently about his understanding. Each time Eddmonds said he understood, and despite the judge's persuasive description of the benefits of a jury, each time he held firm to his decision to waive a jury trial. At a post-conviction evidentiary hearing, Eddmonds' attorney testified that Eddmonds understood the benefit of a jury trial as opposed to a bench trial, and that he and Eddmonds together made the decision to proceed with a bench trial because they did not think Judge Crowley would order the death penalty if convicted. We think that was a valid, if ultimately unsuccessful, tactical decision. Given the horrible details of a crime to which Eddmonds had already con-

---

**2.** In fact, the evaluations of his fitness became increasingly positive as the trial approached. The record suggests why. The initial diagnoses of unfitness referenced Eddmonds' despair that his defense was hopeless and that he was headed for execution. Drs. Reifman and Goldsmith noted this, for instance. Later evaluations reported a more upbeat Eddmonds accompanied by an emerging defense strategy. It appears that Edd-

monds' fitness was directly related to his ability to see a plausible way out, a defense strategy—at least in the way some of his doctors measured fitness. Of course, hopelessness born of facing ineluctable consequences does not make one unfit for trial. But an increasing willingness to do battle in the adversarial process certainly diminishes the concern that a defendant will not get a fair trial.

fessed, and given Eddmonds' irrefutable connections to the evidence, there was a substantial risk that juror outrage at the crime would predispose the jury to convict and impose the death penalty. Eddmonds' decision to trust his fate to the more experienced and dispassionate judge was not unreasonable.

Before trial, Eddmonds took the initiative to prepare and file a pro se motion to substitute counsel, which the trial court granted—something unlikely to happen if at the time Eddmonds were totally despondent or irrational, as he now suggests. At the suppression hearing, Eddmonds' testimony was coherent and very detailed. To take one minor instance, in the process of establishing the factual context of the arrest, Eddmonds' attorney asked him what happened on the way to his grandmother's house. The answer, given three years after the events took place, is revealing for its detail:

A: I stopped off at a couple of places, the liquor store right up under the El at 43rd, I purchased a pint of Dimitri vodka and from there I proceeded on to my grandmother's house.

Q: Where is that located?

A: 746 East 43rd Street, second floor.

[R. 179–180]

Eddmonds then described where he had been earlier that morning:

A: I had just come in fro[m] a friend's house, Irving Johnson, he lived at 5937 South LaSalle. We had been drinking that night because I had told him I was leaving for Milwaukee Saturday morning right after I took care of a little other business at home.

Q: You had been drinking there also, is that correct?

A: I had.

Q: How much?

A. I had brought a fifth of Cutty, a pint of rum, a six-pak [sic] of Tavern Pale and two six-paks [sic].

[R. 180]

, These are hardly rantings or incoherent chatter. They reveal a defendant fully immersed in his defense, either remembering precisely intricate details (the brand names of liquors, exact addresses) from years earlier or artfully making them up. He went on to claim with the same precision that at his interrogation he was high on drugs and alcohol (the factual foundation for which he had carefully laid) and that his confession was the product of police coercion. Eddmonds described what allegedly happened during one portion of the interrogation:

Q: What happened next?

A: It must have been a little while before anybody else started coming in, I don't really estimate what time it was that Officer Liberty and his partner, Edison, started coming in to ask me questions, sometimes I just sat and just looked at them. I asked them why I was handcuffed and they just said, they just told me all I had to do was to answer questions, and they went on for I don't know how long before Officer Jordan started telling me that it was only two ways that I could do it, I could either say what I had to say to them voluntarily or they would see to it that I said it forcefully.

Q: What did you think he meant by that?

\* \* \* \* \* \*

A: That if I wanted to I could confess on my own, if I didn't they would make sure I did it regardless.

\* \* \* \* \* \*

Q: What happened next?

A: I started telling them a story that I felt might suit what they wanted, with the help of Officer Jordan, Johnson and Edison. They began to ask me different questions and I gave them answers. They asked me once about a plastic bag, a yellow plastic bag that they have saw in my grandmother's apartment as you enter the door, and they asked about the plastic bag which they found in the alley....

[R. 188–89]

These statements, on matters trivial and critical, disclose a reasonably intelligent man actively defending his interests. Despite Eddmonds' claims before this court that his

story was ultimately unbelievable, something that can be said of the stories of many defendants, the testimony was that of a fit defendant fully engaged in the adversarial process.

The same is true of his testimony at trial. Eddmonds told an intricate tale of how his friend, Jerome Williams, confessed to raping and killing Richard and had left a bag filled with the boy's clothes at Eddmonds' apartment. Eddmonds claimed he took the clothes out of the bag to look at them, thus explaining his palm print on a newspaper found with the clothes. He also testified that soon thereafter Williams attempted to kill him with an overdose of heroin, but that he suspected the plot and secretly switched the needles, causing Williams' death. Blaming the crime on a dead, drug-addicted friend (who apparently had been in trouble before for molesting children) was not a bad strategy, and Eddmonds told his story well. He even held his ground under intense cross-examination. The problem was not that Eddmonds was unfit to defend himself. Given the overwhelming evidence against him, he did remarkably well. As the prosecutor stated at closing arguments, Eddmonds' story was a "very clever" attempt to "cover each and every aspect of the evidence that was against him." Rather, the problem was that his tale, plausible as it may have first seemed, was not true. It simply made no sense that Eddmonds would repeatedly lie to protect a dead friend who supposedly had tried to kill him when his own life was on the line. But failure to tell convincing lies does not mean a defendant was unfit for trial.

In sum, by the time of trial Eddmonds was able "to consult with his lawyer with a reasonable degree of rational understanding" and "ha[d] a rational as well as factual understanding of the proceedings against him." *Dusky,* 362 U.S. at 402, 80 S.Ct. at 789; *Drope,* 420 U.S. at 172, 95 S.Ct. at 904; *DeRobertis,* 741 F.2d at 1012. His unquestionable capacity to give detailed and coherent testimony at the suppression hearing and at trial and to defend that testimony on cross-examination demonstrates this. The trial transcripts reveal a man with a good memory, a good understanding of the facts arrayed against him, and a firm grasp of his

trial strategy, who deftly responded to the prosecutor's cross-examination, keeping his fabricated testimony reasonably consistent with the facts. Coupled with the numerous psychiatric and psychological examinations finding him fit in the months preceding the trial, this shows that whatever psychoses may have afflicted him, Eddmonds was fit to participate actively and meaningfully in the adversarial process, and in fact did so. That is all the Constitution requires. Therefore, the failure of Eddmonds' trial counsel to request a fitness hearing was not prejudicial within the meaning of *Strickland.*

## B. Effectiveness Of Counsel At Sentencing

 Eddmonds also complains that counsel was ineffective at his capital sentencing hearing because he failed to investigate and present mitigating evidence of long-standing mental problems, including extreme mental and emotional disturbance at the time of the offense, of severe drug and alcohol abuse, and of a troubled upbringing. He further faults his attorney for not making a more extensive closing argument.

 A defendant is entitled to the effective assistance of counsel at sentencing. *Stewart v. Gramley,* 74 F.3d 132, 135 (7th Cir.1996); *see Strickland,* 466 U.S. at 690–91, 104 S.Ct. at 2066. Counsel "must make a 'significant effort, based on reasonable investigation and logical argument,' to mitigate his client's punishment." *Gramley,* 74 F.3d at 135; *Kubat v. Thieret,* 867 F.2d 351, 369 (7th Cir.1989). A claim of ineffective assistance of counsel at sentencing is reviewed under the same cause and prejudice standard as a claim of ineffective assistance in the guilt phase. *Gramley,* 74 F.3d at 135; *Strickland,* 466 U.S. at 690–91, 104 S.Ct. at 2066; *Funchess v. Wainwright,* 772 F.2d 683, 688 (11th Cir.1985). We again proceed directly to *Strickland's* prejudice analysis.

Upon a defendant's conviction for a capital offense, Illinois law provides that the state may request a separate sentencing hearing to determine whether the death penalty should be imposed. 720 ILCS 5/9–1(d). The hearing occurs either before the court or a jury at the election of the defendant. *Id.*

§ 9–1(d)(1)–(3). The hearing proceeds in two stages. First, the state must prove beyond a reasonable doubt that (1) the defendant has been found guilty of murder; (2) he was at least 18 years old at the time of the crime; and (3) at least one of the statutory aggravating factors listed in subsection (b) is present. *Id.* § 9–1(e), (f). If the state has adequately proved these elements, the judge or jury must then determine in a second stage whether the individual defendant merits the death penalty. *Id.* § 9–1(g), (h). At this point, mitigating and additional aggravating factors may be presented without regard to the rules of evidence. *Id.* § 9–1(e). The statute provides a nonexhaustive list of mitigating factors. *Id.* § 9–1(c). If the judge or jury finds there are no mitigating factors sufficient to preclude the imposition of the death sentence, the defendant is sentenced to death. *Id.* § 9–1(h), (g). Otherwise the defendant is sentenced to a term of imprisonment.

At the mitigation phase, Eddmonds offered the testimony of Dr. Reifman, director of the Psychiatric Institute of the Circuit Court of Cook County, who testified generally about Eddmonds' history of mental illness. Dr. Reifman testified that Eddmonds had been diagnosed as schizophrenic and that at one time his mental condition had caused him to be out of touch with reality and incompetent to stand trial.

Eddmonds' principal complaint is that counsel did not ask Dr. Reifman to evaluate Eddmonds to determine whether he acted under the influence of extreme mental or emotional disturbance. The Illinois death penalty statute specifies that extreme mental or emotional disturbance is a mitigating factor. § 9–1(c)(2). By the time of sentencing, two psychiatrists had found Eddmonds sane at the time of the murder. Dr. Kaplan came to this conclusion on September 28, 1979 after an evaluation in which he reported that Eddmonds had a good recollection of what happened on the day of the crime and that his claim that he forgot was "either a conscious device to extricate himself from his current legal situation or is repression that occurred after his confession." At a hearing before the district court, Dr. Kaplan testified that had he been asked, he would have said there was no evidence Eddmonds committed his crimes under extreme mental or emotional disturbance. On November 26, 1979, Dr. Stipes examined Eddmonds for sanity at the time of the murder. He found Eddmonds sane and stated there was no evidence Eddmonds was unable to appreciate the criminality of his actions or to conform his conduct to the requirements of the law.

■ Eddmonds claims it was nevertheless incompetence for his counsel not to seek additional psychological evaluations. The concurrence forcefully argues that counsel had the professional duty to investigate further Eddmonds' mental state and that his failure to do so rises to the level of "gross incompetence." We need not decide whether "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064, because even if incompetent, counsel's performance was not prejudicial.[3] The most that can be said is that there would have been conflicting evidence of mental and emotional disturbance. Dr. Stipes would have testified to mental and emotional disturbance, having changed his opinion in 1985, but his testimony would have been subject to stern cross-examination given the inconsistency. Dr. Henry Conroe might have testified on Eddmonds' behalf. As part of postconviction proceedings in May 1985, Dr. Conroe examined Eddmonds and found he was acting under extreme mental or emotional disturbance at the time of the crime. On the other hand, had Dr. Reifman been asked to conduct a thorough review, he likely would have come to the opposite conclusion. He too rendered an opinion in 1985 after considering all of Eddmonds' psychiatric reports dating back to 1973 and concluded there was no extreme mental or emotional disturbance. Since the evidence was inconclusive on the

---

3. It is worth noting that although by today's standards the performance of Eddmonds' counsel was inadequate for the reasons the concurrence explains, the sentencing hearing was 16 years ago when the standards for attorneys at capital sentencing hearings were not nearly as well developed.

mental/emotional disturbance question, little (or nothing) would have been gained by additional psychiatric testimony; we do not believe the conflicting opinions of competing psychiatrists would have altered the judge's decision. The purpose of mitigation is to reveal something that "goes to show that [the defendant] is not as 'bad' a person as one might have thought from the evidence in the guilt phase of the proceeding." *Gramley*, 74 F.3d at 136. Counsel brought out through Dr. Reifman's testimony that Eddmonds had been diagnosed with schizophrenia and had once been out of contact with reality. That was not proof of mental/emotional disturbance, but as the Illinois Supreme Court noted in addressing this very issue, it did "raise an inference that the defendant was under extreme emotional distress at the time of the crime" without opening the door to positive proof he was not. *Eddmonds II*, 161 Ill.Dec. at 319, 578 N.E.2d at 965.

The aggravating factors support this conclusion. As already noted, the state presented evidence concerning four other rapes committed by Eddmonds. On February 19, 1969, 11-year-old Beverly Mallette was walking to school because she had missed the bus. Eddmonds grabbed Beverly, gagged her with her scarf, forced her into an abandoned building, and raped her. On December 28, 1971, within a month of his release from custody for raping Beverly, Eddmonds abducted Sylvia McClinton from the street, forced her at knife point into an abandoned building, and raped her. Nine days later Eddmonds raped Susie Jones in the same manner. She was eight months pregnant. The state introduced certified copies of Eddmonds' three convictions for these crimes. Michael McArthur also testified that on November 2, 1978, while he was incarcerated in the Cook County jail for armed robbery, Eddmonds used an ice-pick-type weapon to force him to submit to anal sex and then, immediately thereafter, oral sex. This occurred as Eddmonds was awaiting trial in this case. It is very unlikely that inconclusive evidence of mental or emotional disturbance would have overcome this indisputable evidence that Eddmonds is a vicious and rampant sexual predator.

Likewise, further inquiry into Eddmonds' family history would not have shown he was less bad than the rape and murder suggest. Eddmonds' opening brief on appeal relates some of the details of his past (we assume the most noteworthy), none of them particularly helpful to his cause. At age 12 he attempted to get under his mother's dress while she was sleeping. At age 16 or 17 Eddmonds was convicted of his first rape; three more rape convictions would follow. While in prison he engaged in self-mutilation and attempted to kill himself. Out of prison Eddmonds continued to be violent and sexually deviant. He once threw a rock through his sister's window and pulled her door off its hinges after learning her friend was a lesbian. At a family picnic Eddmonds put his hands up his stepmother's dress, had to be physically removed from the back yard, and then tried to choke his 21-year-old niece, saying he had heard bad things about her in prison. He has been diagnosed at various times with "immature personality disorder with antisocial features," in an "early schizophrenic process" perhaps "concealing greater psychotic ideation" and as having a "borderline personality." Much of this information was found in the formal presentence investigation detailing Eddmonds' family history, educational background and employment record, all of which the sentencing judge specifically considered.

Yet none of this would have helped had counsel expressly raised it at sentencing. Past violence and sexual dysfunction are not mitigating factors, and the evidence of past mental problems would have added nothing to Dr. Reifman's testimony that Eddmonds had been diagnosed with schizophrenia. Just because a pattern of violence and sexual misconduct can be shown to have developed early in a defendant's life does not make the defendant unworthy of the death penalty. We cannot assume Eddmonds' past compelled him to rape and murder. Thus, unless counsel omitted evidence that Eddmonds "is not as 'bad' a person as one might have thought from the evidence in the guilt phase of the proceeding," *Gramley*, 74 F.3d at 136, we cannot assume his failure to more fully illuminate Eddmonds' twisted past was prej-

udicial. "[C]apital punishment is not premised on—indeed is inconsistent with—the view that the only reason we think that people act 'voluntarily' is that we have not studied the antecedents of their actions carefully, and that the purpose of a death-penalty hearing is to investigate the defendant's history in sufficient depth to dispel the illusion that he was free not to commit the crimes for which he is being condemned. For then the sentence of death would be the proof that the lawyers had not done their job." *Id.*

 Finally, we cannot forget the crime for which Eddmonds is being punished. The purpose of a sentencing hearing is to determine what punishment the defendant deserves for the crime he committed. A defendant's past is relevant and can be taken into account. But it is the crime of conviction that is the most important sentencing factor. Here the crime was abominable—almost unspeakable. Having been forcibly sodomized by two men, nine-year-old Richard heard a man in a nearby apartment calling to him offering comfort. No doubt desperate for help, Richard climbed the stairs to Eddmonds' apartment only to be told the horror would begin again. His cries brought no sympathy. He was told to be quiet and undress. Eddmonds used a wet rag and toilet paper to clean off the blood and feces already covering Richard. A sheet of plastic was laid on the bed to protect against further mess. Eddmonds then placed Richard face down on the plastic and began to sodomize him. In pain, Richard cried out. Eddmonds demanded silence, but Richard could not comply. (The record states Eddmonds told Richard "it wouldn't take much longer.") Concerned about waking his grandmother in the next room, Eddmonds pushed Richard's face into the pillow to stifle his cries, bearing all his 185 pounds down on the 55–pound child. When Eddmonds was finally sated, Richard was dead.

This was no crime of anger, no quick burst of uncontrollable rage immediately regretted. The lead-up was cold and calculated, at points terrifyingly clinical. We cannot fathom what could cause one to desire to rape a broken and bleeding child. Perhaps that is what we simply call "evil." But we are certain counsel's failure to throw a few more tidbits from the past or one more diagnosis of mental illness onto the scale would not have tipped it in Eddmonds' favor.

 In this context, Eddmonds' attack on counsel's closing argument for being too short is meritless. He made the only argument of any real force—he pleaded for mercy:

If the Court please, I realize your Honor that this has been a long and difficult trial for you to hear. I have only a few things to say.

You must now decide whether or not to kill Durlyn Eddmonds. I submit to you that the facts in this case are not such that Durlyn Eddmonds should be killed. This is not a case, Your Honor, of murder by contract, this [is] not a case, Your Honor, of premeditation. Mr. Eddmonds did not sit down and say to himself I'm going out and kill Richard Miller and go do it. It is a case, Your Honor, where something happened [and] a boy died.

I refer you to the court reporter's statement, your Honor, which is the most reliable piece of evidence of what was said by Mr. Eddmonds to the police. In that court reporter's statement, Mr. Eddmonds said by putting pressure on the boy I was smothering him without knowing it. I turned him over, felt his heartbeat and I gave him mouth-to-mouth resuscitation. He tried to save the child's life, Your Honor.

I wish that the boy was not dead. Mr. Eddmonds wishes too the boy was not dead. Truly killing Mr. Eddmonds will not bring the boy back.

I know, Your Honor, you are a good man and I also know you are a merciful man. You are faced with a very difficult decision, my heart goes out to you.

I ask that you show Durlyn Eddmonds mercy.

This is not gross incompetence under *Strickland.* Counsel's plea for mercy centered on the one thing in Eddmonds' favor: that he never had a specific intent to kill Richard—it was an accident. A strategic decision not to clutter such a plea with a

series of excuses based on a tough childhood and ambiguous claims of mental illness was not incompetence. Moreover, we think the judge's poignant words before sentencing make it clear the outcome would have been the same no matter what the closing argument:

> The Court has considered other mitigating factors including, but not limited to those contained in the social investigation report wherein the defendant's family history, educational background, and employment record are outlined. Any Judge confronted with the awesome responsibility of rendering a death sentence must search for a valid justification against imposing this penalty and favoring an alternative punishment.

> This Court has given long and serious reflection to these matters. The defendant has twice been convicted of grave offenses against minor children. His propensity for depraved and violent behavior present[s] a continuing danger to society both inside and outside the prison walls.

> This defendant's act of murder was exceptionally brutal and heinous indicative of wanton cruelty.

> The Court further finds there are no mitigating factors sufficient to preclude the imposition of the death sentence.

Even if counsel's closing argument was constitutionally deficient, which it was not, Eddmonds was not prejudiced as a result. Eddmonds and his counsel elected not to have a jury for one primary reason—they did not think Judge Crowley would give him a death sentence, or at least there would be a better chance than with a jury. The judge heard all of the evidence and carefully reviewed the record. The crime was brutal; guilt was certain. The aggravating factors were overwhelming. Counsel's strategy was as reasonable as any under these facts. We agree with the district court's conclusion that Eddmonds was not denied the effective assistance of counsel at sentencing.

### III.

Durlyn Eddmonds is an intelligent but vicious man—a rampaging sexual predator who poses a danger both in and outside of prison. Despite a clever story implicating a dead friend, the evidence that he killed a nine-year-old boy while raping him was overwhelming. Eddmonds' claim that he was denied the effective assistance of counsel because his attorney did not request a fitness hearing cannot prevail. Before trial the weight of professional opinion pointed toward fitness. At trial, Eddmonds actively and intelligently assisted in his own defense, thus ensuring the fairness of the proceedings. Though a fitness hearing should have been requested, Eddmonds was not prejudiced as a result. Nor was Eddmonds denied the right to effective assistance of counsel at sentencing. Counsel's failure to offer proof that Eddmonds acted under extreme emotional or mental disturbance was arguably incompetence, but it was not prejudicial. At best the evidence of disturbance was inconclusive and would not have been enough to alter the outcome. The same is true of various details of Eddmonds' past that counsel did not present. None of these facts, individually or collectively, outweighed the countervailing aggravating factors and especially the heinous nature of the crime. Finally, counsel's brief plea for mercy was a valid strategic decision in light of the crime. Therefore we hold that Eddmonds was not deprived of the effective assistance of counsel at trial or sentencing. The decision of the district court denying the petition for writ of habeas corpus is AFFIRMED.

FLAUM, Circuit Judge, with whom ILANA DIAMOND ROVNER, Circuit Judge, joins, concurring.

I fully agree with the majority's well-reasoned conclusions that Eddmonds' conviction and sentence were ultimately not affected by his attorney's performance. I write separately, however, because I would make the additional finding that defense counsel's representation during the critical death penalty stage, while not in the end prejudicial, was constitutionally deficient.

As the majority notes, we measure counsel's conduct during a capital sentencing hearing against the well-established standard that a "significant effort, based on reasonable investigation and logical argument," must be

made to mitigate a client's punishment. *Kubat v. Thieret*, 867 F.2d 351, 369 (7th Cir. 1989); *see also Stewart v. Gramley*, 74 F.3d 132, 135 (7th Cir.1996). Although we have recognized that the exact parameters of counsel's duty to investigate and present mitigating factors may be difficult to ascertain, *see Gramley*, 74 F.3d at 135, in certain situations "it will be apparent from the evidence concerning the circumstances of the crime, from conversation with the defendant, or from other sources of information not requiring fresh investigation, that the defendant has some mental or other condition" that will warrant further investigation. *Id.* In such situations, "the failure to investigate will be ineffective assistance." *Id.*

In my view, it was apparent from the evidence in the record prior to the sentencing hearing that an investigation by defense counsel to determine if Eddmonds was suffering from an extreme mental and emotional disturbance ("mental disturbance") at the time of the crime was required. At the time of the penalty phase, the file before defense counsel revealed that Eddmonds had been examined more than ten times to determine his competency to stand trial, a clear indication that his mental stability was seriously questionable. While the evaluations of fitness became increasingly positive over time, the professional opinions rendered closest to the time of the crime (which is the relevant time for a mental disturbance determination) concluded that Eddmonds was mentally unfit to stand trial.[1] Additionally, among the numerous psychological and psychiatric reports evaluating Eddmonds' competency to stand trial, at least four concluded that Eddmonds suffered from some form of schizophrenia, while others reported diagnoses of various borderline and anti-social personality disorders mixed with depressive features.[2] None concluded that Eddmonds was without psychological problems. The documents in counsel's discovery file also revealed that in 1973, while serving his second sentence for rape, Eddmonds was diagnosed with schizophrenia and spent three months in a psychiatric hospital.[3] Further, the record contained evidence that during his past encounters with the criminal justice system Eddmonds had attempted suicide several times and engaged in self-mutilation. Thus even a cursory review of Eddmonds' file would have revealed long-standing, complex, and often severe mental problems. Such a well-documented mental health history would undoubtedly alert the committed attorney to the existence of possible mitigation evidence and clearly invoke the duty of reasonable investigation. We and other circuits have found a duty to inquire further with much less abundant and consistent documentation of mental illness. *See, e.g., Brewer v. Aiken*, 935 F.2d 850, 857–58 (7th Cir.1991); *Antwine v. Delo*, 54 F.3d 1357, 1367 (8th Cir.1995); *Hill v. Lockhart*, 28 F.3d 832, 845 (8th Cir.1994); *Stephens v. Kemp*, 846 F.2d 642, 652–53 (11th Cir.1988).

The fact that there were two findings of sanity contained in the file before defense counsel does not make his decision to forego further investigation a reasonable one. A finding of sanity is not equivalent to a finding that the defendant was not influenced by a mental disturbance. The Illinois death pen-

---

1. The first doctor to evaluate Eddmonds for competency, Dr. Reifman, found Eddmonds unfit to stand trial. On the same day Dr. Rabin found his competence questionable. Several weeks later, upon initial examination, Dr. Goldsmith of the Illinois State Psychiatric Institute found Eddmonds unfit to stand trial. Dr. Goldsmith eventually concluded, however, that Eddmonds was fit for trial. Near the same time Dr. Stipes concluded Eddmonds was unfit.

2. In December of 1977, Dr. Reifman diagnosed Eddmonds as suffering from undifferentiated schizophrenia. On the same day, Dr. Rabin concluded that Eddmonds suffered from paranoid schizophrenia. Dr. Stipes reached the same di-

agnosis of paranoid schizophrenia in January of 1978. In July of 1978, Dr. Kaplan concluded that Eddmonds suffered from undifferentiated schizophrenia, although he later changed his diagnosis to antisocial personality with depressive features, as did Dr. Rabin. This is not an exhaustive list of the reports documenting Eddmonds' mental problems.

3. Dr. C.T. Ciatteo opined that Eddmonds was in an early schizophrenic process in February of 1973. In March of the same year Eddmonds was diagnosed by several psychologists with borderline personality disorder. These diagnoses were made during Eddmonds' three month stay at Menard Psychiatric Hospital.

alty statute provides that one mitigating factor to be considered is "whether the murder was committed while defendant was under the influence of extreme mental or emotional disturbance, *although not such as to constitute a defense to prosecution.*" 720 ILCS 5/9–1(c)(2) (emphasis added). A person can therefore be declared sane, yet still be suffering from a mental disturbance. This certainly follows, because if a person were insane, his condition would not simply be a mitigating factor, it would be a shield from a sentence of death, if not a defense to the crime itself. *See* 720 ILCS 5/6–2 (setting forth insanity defense). For this reason, if a finding of sanity is sufficient to halt further investigation, then there would rarely be a duty to independently investigate possible mental disturbance, since presumably only sane criminals are subject to the death penalty. A determination of sanity therefore cannot be a sufficient reason to forego inquiry into psychological problems for mitigation purposes. *See Stephens,* 846 F.2d at 653; *Loyd v. Whitley,* 977 F.2d 149, 156–57 (5th Cir.1992).

Yet Eddmonds' attorney essentially abdicated his duty to make reasonable inquiry of mitigating circumstances. In fact, he admitted at both the state court post-conviction hearing and the district court hearing that he could not recall taking any investigative steps prior to the death penalty hearing. There is no indication in the record that counsel asked any mental health expert to examine Eddmonds for possible mental disturbance at the time of the murder, nor did he seek to have any of the experts who had recently evaluated Eddmonds for competency and insanity reexamine him in order to render an opinion on mental disturbance. There was apparently no endeavor by counsel to obtain the actual records and reports documenting Eddmonds' past psychological problems, which were clearly referenced and mentioned in counsel's discovery file. Counsel also chose not to interview any of Eddmonds' family members, who may have had (and as it turns out did have) anecdotal information that would have shed light on Eddmonds' mental condition. It appears evident that defense counsel not only neglected to pursue a mean-

ingful investigation, he attempted, in effect, no investigation.

The district court and the government attempt to cast defense counsel's "choice" to forego investigation as a strategic maneuver supported by "reasonable professional judgment," which we generally afford great deference. *See Strickland v. Washington,* 466 U.S. 668, 689, 690–91, 104 S.Ct. 2052, 2065, 2066, 80 L.Ed.2d 674 (1984) ("[S]trategic choices made after less than complete investigation are reasonable to the extent that reasonable professional judgments support the limitations on investigation."). 466 U.S. at 690–91, 104 S.Ct. at 2066; *see also Antwine,* 54 F.3d at 1367. It is contended that counsel did not seek an evaluation for possible mental disturbance because he was concerned that investigation might result in conclusive proof that Eddmonds was not suffering from a mental disturbance, and then counsel would have been unable to "suggest" that Eddmonds had acted under a mental disturbance through Dr. Reifman's testimony. I am unable to accept this "strategy" as supporting a decision to forsake investigation in this case.

First, counsel never claimed that this creative reason was his rationale for not pursuing mitigating evidence, nor did he follow this strategy, i.e., he never actually "suggested" mental disturbance to the sentencing judge. And we are constrained from "construct[ing] strategic defenses which counsel does not offer." *Harris v. Reed,* 894 F.2d 871, 874 (7th Cir.1990); *cf. Strickland,* 466 U.S. at 673, 699–700, 104 S.Ct. at 2057, 2070–71 (accepting strategy that counsel stated, explained, and clearly followed); *Burger v. Kemp,* 483 U.S. 776, 790–95, 107 S.Ct. 3114, 3123–26, 97 L.Ed.2d 638 (1987) (accepting reasoned explanations offered by counsel for each decision).

Second, and more importantly, this is not a case where counsel's conversations with the defendant or a preliminary investigation had "given counsel reason to believe that pursuing [or continuing] certain investigations would be fruitless or even harmful." *Strickland,* 466 U.S. at 691, 104 S.Ct. at 2066. In such a case, it may be a reasonable professional judgment to limit investigation and

rely only on suggestions or inferences from evidence already in hand. *See, e.g., Strickland,* 466 U.S. at 691, 699, 104 S.Ct. at 2066, 2070; *Burger,* 483 U.S. at 795, 107 S.Ct. at 3126. As just observed, however, in this case a cursory discussion with Eddmonds or his family regarding his mental history, or any review of his file, would by no means have led to the judgment that investigation would be fruitless; but rather should have spurred inquiry. In other words, on the record before him, defense counsel had no solid or reasonable basis for harboring a fear that new reports on mental disturbance would be conclusively negative.[4] Further, even if the evaluations had conclusively reported that Eddmonds was not influenced by a mental disturbance at the time of the crime, then at that point counsel could have made an informed decision not to present the testimony, and the negative reports could have remained confidential. *See People v. Knuckles,* 165 Ill.2d 125, 140, 209 Ill.Dec. 1, 650 N.E.2d 974 (1995) (defense psychiatric expert's conclusions privileged unless called to testify). Thus, the possibility of uncovering harmful evidence did not justify totally foregoing investigation in this case. Full and complete investigation is absolutely crucial in a death penalty situation, and on a record such as this, counsel must be encouraged to fulfill this duty, rather than allowed to circumvent the obligation based on a "fear of what I may find" theory. In my opinion, counsel's decision not to initiate an investigation that was clearly called for by the evidence was not supported by reasonable professional judgment. Therefore, his actions should not be shielded from a label of deficiency under the rubric of strategy.[5]

Moreover, defense counsel did not even effectively "suggest" the possibility of mental disturbance, as the government and the district court claimed it was his "strategy" to do. He did not present the numerous reports demonstrating Eddmonds' history of mental problems (which were readily available at the time of sentencing), nor did he submit the reports into evidence. Counsel did put Dr. Reifman on the stand and elicit testimony from him based on his 1977 report that at one point Eddmonds had been diagnosed as schizophrenic and that his condition had caused him to be out of touch with reality and incompetent to stand trial. Counsel did nothing, however, to prepare Dr. Reifman for his testimony. He did not ask Dr. Reifman to review his own reports on Eddmonds, let alone those of others concerning Eddmonds' mental problems, nor did he ask Dr. Reifman to reevaluate Eddmonds. Counsel simply asked the doctor to bring his file to court. Dr. Reifman, therefore, had no knowledge of the four other schizophrenia diagnoses or of Eddmonds' well-documented, long-standing history of mental illness. Additionally, because counsel had proceeded no further in this regard, he was unable to offer any new reports or testimony supporting Dr. Reifman's prior schizophrenia diagnosis.

In this situation it is not surprising that Dr. Reifman's testimony was severely impeached and undermined upon cross examination. The government forced Dr. Reifman to admit that his conclusions were not verified by any other source, that the stress of incarceration for murder may have induced Eddmonds' mental condition at the time of Dr. Reifman's interview, that other evaluators and he himself at a later date had concluded that Eddmonds was fit for trial, and finally that he was unable to render an opinion on the critical question of whether Eddmonds was influenced by a mental dis-

---

4. And, as we now know, Drs. Conroe and Stipes would have testified that Eddmonds was indeed influenced by a mental disturbance at the time of the offense.

5. The district court also seemed to suggest that counsel's decision was strategically reasonable because the record now reflects that any investigation would have yielded only conflicting reports. The government made a similar argument in defense of counsel's "choice," contending that "[c]ounsel cannot be faulted for failing to present evidence that would not have been helpful to

petitioner's case." However, both of these arguments are inconsistent with the principle, recognized by both the district court and the government, that counsel's actions must be evaluated in light of the evidence available *at the time* of the contested actions. When defense counsel decided to forego further inquiry, he did not know that conflicting reports would be the result, and therefore this cannot justify his actions. Hindsight is relevant only to the question of prejudice, not to that of deficient performance.

turbance at the time of the offense (since he had not been asked to evaluate Eddmonds for such a purpose). Defense counsel did not seek to rehabilitate Dr. Reifman with the reports that were readily accessible. In fact, he performed no redirect and rested his case following this damaging cross examination, thereby abandoning the witness and the modest attempt at mitigation. The ultimate import of Dr. Reifman's testimony was that Eddmonds' psychotic condition at the time of Dr. Reifman's 1977 interview was a one-time aberration, and thus the mitigating value of the testimony was *de minimus*, if non-existent. Counsel did not even mention Dr. Reifman's conclusions in his short closing argument. Had Dr. Reifman been adequately prepared, supported, and rehabilitated, the effort on counsel's part to fulfill his mitigation duties could be viewed more approvingly. The manner in which the witness was managed, however, rendered Dr. Reifman's testimony possibly more damaging than helpful and only supports a finding of deficient performance.

Given counsel's ill-considered decision to forsake investigation, his failure to present the evidence he already possessed, and his questionable handling of Dr. Reifman's testimony, I can only conclude that defense counsel's representation at sentencing "fell below an objective standard of reasonableness," *Brewer*, 935 F.2d at 858, and therefore was "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690, 104 S.Ct. at 2066. As we have previously stated:

> [D]efense counsel must make a "significant effort," based on reasonable investigation and logical argument to ably present the defendant's fate to the [judge] and to focus the attention of the [judge] on any mitigating factors.... [C]ounsel may not treat the sentencing phase as nothing more than a mere post-script to the trial. While the *Strickland* threshold of professional competence is admittedly low, the defendant's life hangs in the balance at a capital sentencing hearing. Indeed, in some cases, this may be the stage of the proceedings where counsel can do his or her client the most good.

*Kubat*, 867 F.2d at 369. Counsel's performance in this case did not constitute the "significant effort" at mitigation this court prescribed in *Kubat*.

In the end, however, I must agree with the majority that defense counsel's deficient performance did not ultimately prejudice Eddmonds. We *now* know that the results of the investigation that should have been conducted would have rendered conflicting results, and I cannot say that there is a reasonable probability that such inconclusive results would have been sufficient to overcome Eddmonds' serious criminal history and the horrifying nature of Richard Miller's death. This concurrence is proffered mainly to express deep concern over the absence of a meaningful investigation in preparation for the mitigation phase of this matter and in order to underscore that such a subminimum performance should not be viewed as an acceptable benchmark of representation in a capital case.