UNITED STATES of America, Plaintiff–Appellee,

v.

Alfred James PRINCE, Defendant–Appellant.

No. 90–6370.

United States Court of Appeals, Tenth Circuit.

July 9, 1991.

---

Timothy D. Leonard, U.S. Atty., and Ted A. Richardson, Asst. U.S. Atty., Oklahoma City, Okl., for plaintiff-appellee.

Bill Zuhdi, Oklahoma City, Okl., for defendant-appellant.

Before ANDERSON, BARRETT and BRORBY, Circuit Judges.

BRORBY, Circuit Judge.

While the public's perception of lawyers seems to reach new lows every day, parents—we are told—still encourage their children to enter this profession.[1] But the parent who happens to read this opinion may not be so quick to urge a loved child to become a lawyer after learning how the defendant in this case expressed his extreme personal dislike of his lawyer. Like-

wise, the would-be lawyer raised on the hit television series, *L.A. Law*, to believe a law degree is that golden ticket to a glamorous career of big money, fast cars and intimate relationships among the beautiful people may think twice before sending in his or her law school application when word of this case gets out.[2]

### I.

Defendant in this case is Alfred James Prince (hereinafter Defendant). He was convicted in federal court of robbing an Oklahoma savings and loan, and of using a sawed-off shotgun during the robbery.[3] His guilt for these crimes is not an issue in this appeal.

Shortly after Defendant's arrest a federal public defender was assigned as his lawyer. Defendant, however, did not care for his lawyer. Realizing this, the lawyer asked the judge to take him off the case, but the judge refused. Finally, the matter was ready to be tried. Just before the jury was to be sworn in and seated the lawyer urged the court to reconsider his request to withdraw, telling the judge his client "simply does not want to talk to me." But the judge again refused, finding "absolutely no reason whatsoever" for allowing the attorney to withdraw. Defendant, who was present and heard the judge's decision, apparently decided to give the judge a reason.

As the jury was being sworn in Defendant became loud and disruptive. He managed to get out of his pants and expose a key portion of the lower part of his anatomy to the judge and jury. He then began to urinate in the presence of the jurors, and some of the urine struck the table which was being used by his lawyer.

ber of law school applications. *See* Orey, *Sex! Money! Glitz! In–House at L.A. Law*, The American Lawyer, Dec.1988, at 32.

**3.** The specific federal laws Defendant was charged with violating are the ones against bank robbery, 18 U.S.C. § 2113(a) and (d), and for unlawfully using a firearm during the commission of a violent crime, 18 U.S.C. § 924(c)(1). He was convicted on Sept. 25, 1990, and sentenced to just over twenty-eight years in prison.

**1.** *See The '80s; Lawyers*, National Law Journal, Dec. 25, 1989, at S16.

**2.** Law school admissions directors point to *L.A. Law* as one possible factor in the growing num-

Needless to say, the proceedings were then halted. Defendant was "helped" from the courtroom by United States Marshals and the jury was excused.

When Defendant was brought before the judge a few minutes later we assume, although the record does not so state, he was fully dressed. The judge admonished and instructed Defendant to conduct himself "in a manner consistent with order and decorum in the courtroom." Defendant responded to this stern warning by moaning loudly. Next, Defendant's lawyer, who was still on the case despite Defendant's wishes, moved for a mistrial and for a psychiatric evaluation of the Defendant. Defendant continued moaning while his lawyer and the judge spoke briefly about the motions. Defendant then began to supplement his moans with screams. The judge ordered the United States Marshals to remove Defendant, and five deputy marshals escorted the now completely unruly and physically struggling Defendant from the courtroom.

The judge then ordered a psychological examination of Defendant and the trial was postponed. Subsequently, Defendant's lawyer filed another motion to withdraw and the judge, presumably now fully convinced that Defendant really did not care for his lawyer, granted the motion. Another lawyer from a private law firm was assigned the case. He represented Defendant at trial and continues to represent him in this appeal. Eventually, a separate jury, with no knowledge of the facts just described, was seated and heard the case after Defendant got his new lawyer.

Results from the court ordered psychological exam indicate Defendant was mentally competent to be tried. The treating physician concluded Defendant knew he was charged with bank robbery and could cooperate with an attorney if he chose to do so. The doctor reported Defendant discussed his courtroom behavior during the examination. According to the doctor, Defendant "wanted to fire his attorney but ... the judge had prevented him from doing so." Defendant "admitted to having acted out by standing and urinating on papers and attempting to urinate on his attorney."

## II.

The only issue on appeal is Defendant's contention that the trial judge erred and abused his discretion by refusing to order a second mental competency examination after completion of the initial exam.

 When deciding whether a criminal defendant is competent to stand trial, a court determines if the defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960). "[A] trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial." *Drope v. Missouri*, 420 U.S. 162, 181, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975). Evidence of a defendant's behavior and demeanor at trial are relevant as to the ultimate decision of competency to stand trial. *Pate v. Robinson*, 383 U.S. 375, 386, 86 S.Ct. 836, 842, 15 L.Ed.2d 815 (1966).

 Defendant in this case was ordered examined pursuant to a federal statute providing, in relevant part, that "[a]t any time after the commencement of a prosecution for an offense ... the defendant or the attorney for the Government may file a motion for a hearing to determine the mental competency of the defendant." 18 U.S.C. § 4241(a). The medical report resulting from this examination indicated Defendant knew he was charged with bank robbery, and while he would be difficult to work with, he could cooperate with a lawyer if he chose to do so.

In attacking the district court's refusal to order a second competency exam, Defendant points to his continuing disruptive behavior while at the hospital for the first exam. Defendant recounts how he set fire to his hospital cell, told his new lawyer he was hearing voices, tried to commit suicide

by cutting his wrist, and had no memory of the bank robbery. What Defendant fails to grasp is that all of these behaviors were noted and discounted in the single psychological report.

As the report reveals, Defendant set fire to his hospital cell and had to be removed while the fire was put out. He further told his doctor he was hearing voices, but "was extremely vague in describing the voice, claiming that he did not know whether it was a man's or a woman's voice, and [was] unable to state what the voice had allegedly told him." His suicide attempt was described in the report as an acting out behavior occurring after the hospital staff gave him a razor because Defendant said he wanted to shave. Defendant took the blade and made a number of "very superficial scratches to his left wrist and right lower abdomen." Very little bleeding occurred.

Defendant's story about having no memory of the bank robbery also changed during his hospitalization. According to the psychological report, Defendant knew he was charged with bank robbery and that the crime happened in December 1988, but "claimed he did not participate in the robbery and that he was elsewhere at the time." He did not say he had no memory of the crime.

In summary, the single medical report described Defendant as a very problematic and uncooperative patient who went to great lengths to convince the hospital's staff he suffered from mental problems. In the end, however, the most the evaluating physician could say was that Defendant's behavior was "fabricated," and Defendant was "not suffering from a severe mental disease or defect that renders him mentally incompetent to the extent that he is presently unable to understand the nature and consequences of proceedings against him or to assist properly in his defense if he chooses to do so." With this conclusion in hand, and with no other suggestion of mental problems, the district court denied Defendant's request for another exam.

■ The decision on whether to order a second competency exam is a matter wholly within the sound discretion of the trial court. *United States v. Crosby,* 713 F.2d 1066, 1078 (5th Cir.), *cert. denied,* 464 U.S. 1001, 104 S.Ct. 506, 78 L.Ed.2d 696 (1983). *Cf. United States v. Hill,* 526 F.2d 1019, 1023 (10th Cir.1975) (trial judge acts within his range of discretion when he denies motions for psychiatric examination on the ground of lack of good faith in making the motions), *cert. denied,* 425 U.S. 940, 96 S.Ct. 1676, 48 L.Ed.2d 182 (1976). We will not reverse a trial court's refusal to order a second competency exam unless we conclude the trial court's decision was an abuse of its discretion. *See United States v. Bodey,* 547 F.2d 1383, 1387 (9th Cir.) (examination of the trial record shows trial court did not abuse its discretion in refusing to order a psychiatric exam), *cert. denied,* 431 U.S. 932, 97 S.Ct. 2639, 53 L.Ed.2d 249 (1977); *United States v. Stevens,* 461 F.2d 317, 321 (7th Cir.) (record examination reveals trial court did not err in failing to order further competency exam), *cert. denied,* 409 U.S. 948, 93 S.Ct. 292, 34 L.Ed.2d 218 (1972).

There is no evidence in this record of any irrational behavior by Defendant that was not adequately explained in the single competency report. Nor has Defendant pointed to any subsequent behavior following the one exam that even slightly hints he later became incompetent. *See, e.g., Robinson,* 383 U.S. at 386, 86 S.Ct. at 842 (demeanor at trial relevant to the ultimate decision as to sanity). We note the motion for the first examination was not objected to by the prosecution, and that the judge was rightly concerned about whether Defendant's behavior was "a genuine reflection of psychiatric or psychological disorders or whether it is a contrived attempt to obstruct and delay these proceedings." We hold the district judge did not abuse his discretion when he declined to order a second competency examination.

### III.

In conclusion, there is no rule of law equating intentional and public displays of

incontinence with incompetence. The trial judge, court personnel, and lawyers who stuck with this case in spite of the unique hazards of working with this defendant are to be commended. As for the one-time budding lawyer whose hopes for a dazzling life have now been dashed by the facts of this case, we suggest an alternative career in screenwriting. Stories about lawyers are in wide demand, and this case—now that it is in the public domain—could be part of your first plot.[4]

The judgment of the district court is AFFIRMED.

---

**4.** Unusual stories like this one are apparently standard fare for the fictional television lawyers of *L.A. Law,* who face many obstacles before cashing their paycheck and speeding off to another intimate dinner-party. One news story described the typical *L.A. Law* plot as follows:

The divorce lawyer is in bed with his client. Again. A name partner ducks gunshots in court. An overzealous new associate cross-examines a witness to death—literally. The messenger accidentally shreds a key file. A secretary and two lawyers are using insider information to make stock trades.

Orey, *Sex! Money! Glitz! In–House at L.A. Law,* The American Lawyer, Dec.1988, at 32.