**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 12 1997**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

       Plaintiff-Appellee,

v.

DORA WILLIAMS,

       Defendant-Appellant.

No. 96-2075

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
**(D.C. No. CR-95-15 LH)**

---

Submitted on the briefs:[*]

Ron Koch, Albuquerque, New Mexico, for Defendant-Appellant.

John J. Kelly, United States Attorney, and Charles L. Barth, Assistant United States Attorney, Albuquerque, New Mexico, for Plaintiff-Appellee.

---

Before **PORFILIO**, **McWILLIAMS,** and **BALDOCK**, Circuit Judges.

---

[*] After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed. R. App. P. 34(a); 10th Cir. R. 34.1.9. The cause therefore is ordered submitted without oral argument.

**PORFILIO**, Circuit Judge.

---

Of the several issues raised in this appeal of her conviction for possession with intent to distribute cocaine, the question whether defendant Dora Williams was competent to stand trial predominates. We conclude she was not, vacate the judgment of conviction and sentence, and remand with instructions for the trial court to determine Ms. Williams' competence to stand trial. However, whatever slate that determination produces, we also conclude it is free of the question of any possible evidentiary taint from the allegedly unlawful search professed here.

**I.**

Ms. Williams was a passenger on an Amtrak train which DEA Special Agent Kevin Small boarded during a routine stop in Albuquerque, New Mexico. Suspicious of the new tweed suitcase perched above her seat in the coach car, Agent Small questioned Ms. Williams and her traveling companion, Maricella McToy. Based upon their statements, Agent Small seized the suitcase, broke off the locks, and uncovered approximately five kilograms of cocaine. The grand jury subsequently charged Ms. Williams and Ms. McToy with possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1), 21 U.S.C. § 841(b)(1)(A), and 18 U.S.C. § 2.

Only Ms. Williams stood trial, the court having released upon certain conditions Ms. McToy who promptly absconded from the jurisdiction. Ms. Williams' second attorney filed a motion to suppress the evidence seized on the train and the statements she made coincident to the seizure and her arrest. Although the court granted the motion in part, suppressing the government's use of her statements, it rejected her contention the train encounter was nonconsensual and concluded, based upon both defendants' statements to Agent Small, the suitcase was abandoned property.

Three weeks before trial, Ms. Williams fired her second attorney, and the court appointed a third, Lawrence Chacon, who moved to withdraw as counsel after the jury was seated. As her trial commenced, Ms. Williams, speaking rapidly and excitedly, bombarded the court with requests, asking to make an opening statement, to fire her attorney, to introduce a disputed tape and transcript of the train encounter, to ascertain the presence of certain witnesses, and to protest the composition of the jury. Defense counsel explained to the court his efforts to appease Ms. Williams' concerns, discounting her representations but acknowledging his difficulty reconciling her demands with his professional responsibility.

The government then interjected that Ms. Williams was taking medication and suggested the court inquire. Ms. Williams told the court she took Elavil, an antidepressant, and explained, "when you was telling me to slow down in my talking, I'm a very hyper person ... I started taking them because I'm in a situation ... I don't have

anything. ... They put me on medication because, when they released my co-defendant

and held me -- and I have heart murmur also. And the doctors sent me up to the hospital.

When I went out to the hospital, they examined my heart and stuff like that. They felt that

it was necessary for them to put me on some kind of antibiotics." She told the court the

medication did not interfere with her ability to understand. Asked if it interfered with her

ability to communicate with her attorney, she responded:

> Ms. Williams: Well, sir, my attorney right now --
> The Court: Can you answer the question?
> Ms. Williams: No. I mean, yes, sir. My ability to deal with my attorney,
> my attorney is not for me. So yes, sir.

After a recess,[2] the court ruled,

> [W]hile the defendant is excitable and prone to making outbursts and
> interrupting the proceedings, that she is otherwise understanding the
> proceedings, is communicating with her attorney. She is able to cooperate
> and assist in her defense. And I conclude that the medication that she is on
> is not affecting her ability to do so.

With the jury seated, the government began its examination of Agent Small, soon

prompting Mr. Chacon to inform the court Ms. Williams was "just very, very, very, very

---

[2]Prior to the recess, the court again permitted Ms. Williams to voice other concerns and attempted to address her questions although she persistently interrupted the explanations despite the court's repeated admonition not to interrupt but to trust her attorney. "Sir, this man here only been on my case three weeks," she told the court, interrupting again when the court attempted to tell her to communicate more with her attorney. The court denied defense counsel's motion to withdraw. Again Ms. Williams asked, "Sir, is there any way that I can decline -- fire this attorney." The court told her not at that stage in the proceedings, and she interrupted "Sir, you're going to say that I don't have a right to a fair trial? You said that I did." The court then admonished Ms. Williams to confer quietly with her attorney.

upset and she's sitting there crying and can't really control herself." The jury excused, defense counsel told the court,

> I don't know if she doesn't understand the proceedings, the procedure, how court is conducted, how a trial is conducted. She is -- at this point, basically what I'm doing, because I'm not out in front of the jury doing something or cross-examining at this time Mr. Small. She just wants to leave. She doesn't want to be a part of this. And she reiterates, I think, her need to, I guess, fire me, basically.

While telling Ms. Williams ("I'm not understanding you. Calm down."), the court assured her that defense counsel was adequately representing her interests although she interrupted the explanation.

The government resumed questioning Agent Small again to be interrupted by Ms. Williams who asked to leave the proceedings. The court retired the jury, and Ms. Williams announced she was firing her attorney because he wasn't representing her and she couldn't sit and "watch my rights be violated."[3] The court ordered her not to interrupt and to sit down.

> Ms. Williams: Sir, I'm leaving this courtroom.
> The Court: No, you're not.
> Ms. Williams: Yes, I am. What you going to do, have me handcuffed to the chain? [sic]. You want me to sit here and watch you have all my rights violated?

---

[3]Ms. Williams apparently expected her counsel to interrupt and ask questions during the government's direct examination of Agent Small, not recognizing that defense counsel would preserve "her rights" by cross-examining the witness.

Ending the stalemate by ordering the marshal to take Ms. Williams away, the court recessed the proceedings. These interchanges pocked the first day of Ms. Williams' two-day trial.

On the second day, the proceedings fared no better, Ms. Williams having decided to testify on her own behalf. Frustrated with the nonresponsiveness of her answers, the court advised Ms. Williams to listen carefully to counsel's questions and to talk slowly, concentrating on the question, to best communicate her case to the jury. Ms. Williams then told the court she did not take her medication, the marshal having forgotten to give it to her that morning. The court made no further inquiry, and Ms. Williams proceeded to testify, interrupting questions, her responses divagating from the questions into argumentative or self-pitying statements, disregarding the court's repeated warnings. With Ms. Williams' seeming disregard for the court's caution, the court began striking her responses, instructing the jury to disregard her nonresponsive narratives. Continuously, the court told Ms. Williams, "[S]top. Do not say anything until [counsel] has asked the question." To say that Ms. Williams was out of control during the second day of the proceeding euphemizes the record.

After the jury found Ms. Williams guilty, her fourth attorney appeared for a hearing on two motions, the first for recusal, the second for a forensic evaluation. As to the former, the court reviewed the history of the case and refused to recuse itself from further proceedings, again entertaining Ms. Williams' numerous interruptions. For the

latter, new defense counsel, Ron Koch, asked the court to take note of Ms. Williams "crying, extremely upset, very animated, in my opinion, hysterical." The court then stated for the record, "[t]he defendant is hysterical. She is interrupting the proceedings. She is sobbing. What she is saying is such that I cannot understand it and my court reporter has indicated to me that what she is saying is not possible to place in the record." Counsel then told the court of his concern about Ms. Williams' competence and overall mental health. He noted Ms. Williams' long history of mental instability intertwined with her continuous interactions with the criminal justice system beginning at the age of thirteen. He informed the court that when he tried to review the presentence report with Ms. Williams, she was unable to focus. "Now, where that raises questions in my mind is the ability to assist. And I'm convinced that she wasn't able to assist Mr. Chacon at trial because Dora, in her own way, because of her mental condition, had her own agenda, and that resulted in the repeated outbursts, the interruptions, all those kind of things, and, in my mind, not a true understanding of the nature of the proceedings. I think that all stems from mental disorder." The court agreed that during trial Ms. Williams only focussed on questions for a short time and frequently interrupted. It stated, "So it did concern me that her attention span was shorter than I would have expected." The court believed, however, Ms. Williams' ability to list several issues for her appeal evidenced she understood the proceedings. Nevertheless, the court ordered a psychological evaluation to assist the court in sentencing.

- 7 -

Based upon an evaluation of her FBI arrest record, the Presentence Report, and other documents, as well as psychological testing and personal interviews, the forensic report noted Ms. Williams' extensive history of legal problems and drug addiction. It stated "[h]er use of Elavil is a continuation of her substance abuse pattern." The psychologists concluded Ms. Williams then displayed "adequate cognitive ability to understand and appreciate the interaction which will occur among court personnel, herself, and potential witnesses." They concluded she was competent to proceed with sentencing.

## II.

Competency involves defendant's mental state at the time of trial asking whether the accused is capable of cooperating in her own defense. "The focus of a competency inquiry is the defendant's mental capacity; the question is whether [she] has the *ability* to understand the proceedings." *Godinez v. Moran*, 509 U.S. 389, 113 S.Ct. 2680, 2687 n.12 (1993). "Requiring that a criminal defendant be competent has a modest aim: It seeks to ensure that he has the capacity to understand the proceedings and to assist counsel." *Id.* at 2688. To make that assessment, the court reviews "evidence of defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial." *Drope v. Missouri*, 420 U.S. 162, 180 (1975).

On numerous occasions arising in different contexts, the Court has reiterated that the criminal prosecution of an accused person while legally incompetent offends the Due

Process Clause of the Fourteenth Amendment. ***Bishop v. United States***, 350 U.S. 961 (1956); ***Pate v. Robinson***, 383 U.S. 375, 385 (1966). "It has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial." ***Drope***, 420 U.S. at 171. To be judged competent to stand trial, "the test must be ... whether [the defendant] has sufficient *present ability* to consult with his lawyer with a reasonable degree of rational understanding --- and whether he has a rational as well as factual understanding of the proceedings against him." ***Dusky v. United States***, 362 U.S. 402, 402 (1960) (italics added).

Because neither side moved for the trial court to hold a competency hearing, we must decide "whether a reasonable judge, situated as was the trial court judge whose failure to conduct an evidentiary hearing is being reviewed, should have experienced doubt with respect to competency to stand trial." ***United States v. Crews***, 781 F.2d 826, 833 (10th Cir. 1986) (citation omitted). Moreover, with no competency determination before us, our review is not limited by the clearly erroneous standard but is comprehensive. ***Id.***

Here, Ms. Williams claims deprivation of both her procedural and substantive rights to due process, the former when the court failed to conduct a hearing on her competency on its own initiative and the latter by submitting her to a criminal prosecution

when she was incompetent to stand trial. Neither right can be waived, she asserts, nor can the trial court avoid its responsibility to assure both.

We agree. In this case, although the court, at the government's suggestion, asked Ms. Williams about the medication she was taking, and ruled, based solely on her statement, she understood the proceedings and could communicate with her attorney, Ms. Williams' demeanor during trial and irrational behavior should have challenged that initial assessment. That is, Ms. Williams' outbursts and hysteria should have triggered a "bona fide doubt" about the petitioner's competency to stand trial. ***Medina v. Singletary***, 59 F.3d 1095, 1106 (11th Cir. 1995) (quoting ***James v. Singletary***, 957 F.2d 1562, 1569-70 (11th Cir. 1992)). Even if defendant appears competent at the start of trial, "a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial." ***Drope***, 420 U.S. at 181.

Clearly, on the first day of trial Ms. Williams misapprehended her attorney's role and became upset, causing her attorney to advise the court that he wondered whether his client understood the proceedings. Whatever present ability she had to consult her attorney should have been further investigated when Ms. Williams cryptically answered the court's question about whether her taking the medication interfered with her ability to communicate with her attorney. Indeed, if her erratic behavior on the first day of trial was insufficient to alert the trial court to a bona fide concern, surely her demeanor during

the second day should have. Ms Williams' outbursts, hysteria, and defiance were adequate warnings to alert the court of defendant's present ability to assist in her defense. Absent a motion for a hearing to determine her competency, the court "shall order such a hearing on its own motion." 18 U.S.C. § 4241.

Despite its patience and dispassion in controlling the proceeding, the court misapprehended the scope of its inquiry into defendant's competence to stand trial. Ms. Williams' listing issues for her appeal alone does not establish her competence. Proper assistance encompasses more than merely providing information but is "extended to comportment in the courtroom before a jury." *United States v. Hemsi,* 901 F.2d 293, 295 (2d Cir. 1990). That defendant can recite the charges against her, list witnesses, and use legal terminology are insufficient "for proper assistance in the defense requires an understanding that is 'rational as well as factual.'" *Id.* (quoting *Dusky*, 362 U.S. at 402). Nor can the later forensic evaluation done for purposes of ascertaining Ms. Williams' ability to assist in her sentencing validate its failure to inquire earlier. Retrospective determinations of an accused's competence to stand trial are, at best, problematic, and, at worst, untrustworthy. *Pate*, 383 U.S. at 387.

Although Ms. Williams' conduct included outbursts, interruptions of the attorneys, and defiance of the district court's instructions, we emphasize that we find that the record raises a genuine, reasonable doubt about her competency to stand trial and not that she merely engaged in obstructionism during the proceedings. The district court should have

held an evidentiary hearing to resolve the doubt. ***Monty P. Sena v. New Mexico State Prison***, ___ F.3d ____, No. 95-2170, 1997 WL 111255 (10th Cir. Mar 13, 1997). "For, once doubt is raised, the court cannot dispel it simply by relying on contrary evidence. The protections of an adversary proceeding must be afforded the defendant." ***Id.,*** at *3 (citations omitted). Having failed to do so in this case was a denial of Ms. Williams' right to procedural due process. Without having afforded Ms. Williams the opportunity to establish her competence "in the crucible of a full-blown evidentiary hearing," ***id.***, we cannot say with surety that her substantive due process right to stand trial while competent was not violated. With the hearing, we can assure her right to procedural due process is met by affording defendant her constitutional right to a fair trial. ***Drope***, 420 U.S. at 181-82.

We, therefore, vacate the judgment of conviction and remand for the trial court to evaluate defendant's present competence to stand trial. Based upon that outcome, the trial court shall appropriately proceed with the case.

### III.

Ms. Williams contends Agent Small singled her out because of her race and complains the resulting encounter was an investigative detention conducted without reasonable suspicion under the totality of the circumstances. She likens her case to ***United States v. Bloom,*** 975 F.2d 1447 (10th Cir. 1992), which invalidated an Amtrak train search based, in part, upon finding the facts the DEA agent used to establish

reasonable suspicion were as consistent with innocent travel as with his hunch about criminal activity.

To agree with Ms. Williams, we must conclude the facts the trial court found were clearly erroneous. *United States v. Guerrero-Hernandez*, 95 F.3d 983, 986 (10th Cir. 1996); *United States v. Walker*, 941 F.2d 1086, 1090 (10th Cir. 1991). Our review of the evidence indulges the trial court's determination. *United States v. Wood,* 106 F.3d 942 (10th Cir. 1997). "We are mindful that at a hearing on a motion to suppress, the credibility of the witnesses and the weight given to the evidence, as well as the inferences and conclusions drawn therefrom, are matters for the trial judge." *United States v. Little*, 60 F.3d 708, 712 (10th Cir. 1995) (quoting *United States v. Fernandez,* 18 F.3d 874, 876 (10th Cir. 1994). Whether those facts then amount to reasonable suspicion is a question of law which we review de novo. *Bloom*, 975 F.2d at 1456.

The trial court articulated several findings in denying the motion. It found Agent Small boarded the train on December 13, 1994, making his way from the rear sleeper car and eventually into the open coach car where he spotted a large new, blue tweed suitcase without an identification tag on the overhead luggage rack. Crediting the agent's experience of 220 "events" involving suitcases, 180 of which were new and without identification tags, the court also noted the agent observed the destination tag hanging from the bag, "JOL," for Joliet, Illinois, a stop before Chicago where there was no drug interdiction unit. With no one sitting by the luggage, Agent Small hefted the bag, which

- 13 -

was very heavy, which the trial court credited - in the officer's experience - to indicate controlled substances might be packed inside. His suspicion aroused, Agent Small left the car to ask the train attendant who was sitting by that particular bag, and the attendant identified Ms. Williams and Ms. McToy, passengers who had boarded in Fullerton, California, with a baby and two large bags. When Agent Small returned to the car, he found Ms. Williams sitting beneath the suitcase and playing with the child. He identified himself and asked if he could speak with her. The trial court found Ms. Williams "was rather defensive,"[4] telling Agent Small he didn't have probable cause to speak to her and disassociating herself from the suitcase. With this disclaimer, Agent Small reached up and removed the bag. Ms. Williams grabbed the suitcase,[5] telling him she was watching it for the lady who sat across the aisle. Agent Small left and soon observed this traveling companion, Maricella McToy, return to her seat across the aisle from Ms. Williams. Agent Small approached Ms. McToy, and upon finding her responses incongruous, verified with the train attendant that these two women were, in fact, the ones who carried on these bags. Ms. McToy also disclaimed ownership of the bag prompting Agent Small

---

[4]According to Agent Small, when he asked Ms. Williams if he could talk to her, she answered, "what about?" When he asked where she was traveling to, she asked why and pointed up to the tag marked "JOL" hanging off the suitcase. She then asked the agent why he picked her out from all the other passengers on the train, and he told her it was because of the suitcase. Agent Small then asked her if the suitcase was hers. She hesitated and answered no.

[5]Agent Small recorded some of this encounter although when Ms. Williams attempted to grab the suitcase, she perhaps bumped the officer and the recording became inaudible. The later transcriptions of that recording became the subject of dispute at trial.

to seize it, hauling it off to the baggage area where he broke off the locks and discovered five kilos of cocaine under some clothing. His subsequent questioning of Ms. McToy and Ms. Williams revealed they had purchased one-way train tickets with cash under assumed names. A second black suitcase contained a small, blue tweed bag matching the larger one Agent Small had seized.

Based on these facts, the court found "at no time was [Ms. Williams] restrained in any way and that she was free to go." The court also concluded, based on Ms. Williams' testimony, the bag had been abandoned. Ms. Williams contests neither conclusion but argues Agent Small lacked reasonable suspicion to detain her and question her about possible criminal activity.

Although the trial court did not elaborate, its finding Ms. Williams was not restrained and free to go indicates it concluded this police-citizen encounter was consensual, not implicating the Fourth Amendment. *Bloom*, 975 F.2d at 1450 (citations omitted). Based on his observation of the new suitcase, its weight and destination tag, Agent Small approached Ms. Williams and asked her several non-intrusive questions. During that initial questioning, Ms. Williams was free to leave and did, in fact, communicate her desire not to communicate with him. *Bostick* established "a seizure does not occur simply because a police officer approaches an individual and asks a few questions." *Florida v. Bostick*, 501 U.S. 429, 111 S.Ct. 2382, 2386 (1991). Ms. Williams volunteered the suitcase wasn't hers. Although Agent Small might have

decided to provoke what transformed itself into an investigative detention by removing

the suitcase, Ms. Williams then volunteered information permitting the agent - based on

his present objective observations and her responses - to question Ms. McToy.   The result

of that questioning permitted Agent Small to conclude the suitcase was abandoned,

precipitating the search and seizure of cocaine.  Whatever investigative detention

subsequently transpired was surely supported by that evidence.

Consequently, we conclude when Agent Small first encountered Ms. Williams and

questioned her, she was not "seized" within the meaning of the Fourth Amendment.  As

the district court also found, even after agents discovered the cocaine, Ms. Williams left

the train to make a telephone call.  We conclude the trial court properly denied her motion

to suppress.

This case is therefore **VACATED** and **REMANDED** for proceedings consistent

with this opinion.  We do not address the additional issues raised given this disposition.