**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 5, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

     Plaintiff-Appellee,

v.

HILARIO CORNEJO-SANDOVAL,

     Defendant-Appellant.

No. 08-2070

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
**(D.C. No. 1:06-cr-00265-WJ-1)**

---

Brian Pori, Inocenté, P.C., Albuquerque, New Mexico, for Defendant-Appellant.

Laura Fashing, Assistant United States Attorney (Gregory J. Fouratt, United States Attorney, with her on the brief), Albuquerque, New Mexico, for Plaintiff-Appellee.

---

Before **McCONNELL**, **HOLLOWAY**, and **BALDOCK**, Circuit Judges.

---

**BALDOCK**, Circuit Judge.

---

Defendant Hilario Cornejo-Sandoval appeals his conviction, alleging violations of his procedural and substantive due process rights. Specifically, Defendant contends the district court erred by (1) failing to order a second competency hearing during trial based on Defendant's unusual behavior, and (2) allowing him to be tried and convicted while incompetent. Exercising

jurisdiction under 28 U.S.C. § 1291, we affirm.

I.

In late 2005, the Florida Department of Law Enforcement opened an investigation based on information provided by Barbaro Veloz, a/k/a "El Pequeño" ("The Little One"), a confidential informant. Veloz reported that Defendant, a/k/a "El Sapo" ("The Toad"), had the ability to procure kilogram quantities of cocaine. Eventually, Drug Enforcement Administration (DEA) authorities in New Mexico took the lead role in the investigation because the transaction was to take place there. After numerous delays, on January 24, 2006, Veloz and Defendant traveled separately to Albuquerque, New Mexico, in order to consummate a drug deal. The next day, Defendant, along with two companions met with Veloz, who was accompanied by an undercover DEA agent, at a local Albuquerque fast-food restaurant to discuss the particulars of the drug transaction. Veloz and the agent agreed to pay $20,000 per kilogram for eleven-and-a-half kilograms of cocaine.

A day later all parties met in the parking lot of the same restaurant to consummate the deal. Defendant arrived in a van with the same two companions, one of whom approached Veloz and the DEA officer with a kilogram of cocaine, informing them that it was a sample, and that ten-and-a-half more kilograms were waiting for them in Taos, New Mexico. A dispute about payment ensued. Defendant and his two companions re-entered the van and sped off as police arrived. The police gave chase, catching all three men shortly thereafter. They found Defendant in a

2

nearby residential neighborhood hiding beneath a discarded Christmas tree. Authorities recovered 1,009 grams of cocaine in the vicinity of the restaurant parking lot.

On February 7, 2006, a federal grand jury returned a two count indictment against Defendant and his two companions. Count 1 charged Defendant with conspiracy to possess with intent to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) & 846. Count 2 charged Defendant with possessing 500 grams or more of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1). The district court assigned Mr. Brian Pori as counsel for Defendant. At Mr. Pori's request, the district court referred Defendant to Eric Westfried, Ph.D., a clinical psychologist board-certified in forensics and neuropsychology, for a competency evaluation.

Dr. Westfried filed a detailed report with the district court on October 18, 2006. After a 5.75 hour interview in which he performed a battery of tests, Dr. Westfried concluded that Defendant was "not presently insane or otherwise so mentally incompetent as to be unable to understand the proceedings against him or properly assist in his own defense." Dr. Westfried's report noted that Defendant was "resistant and possibly uncooperative," and that he was "angry with his attorney and does not feel he is receiving adequate representation." The report explained, however, that Defendant's feelings were likely due to a "frequent expectation of people from Mexico . . . that payment of high fees to an attorney resolves any legal

3

issues in even serious cases." Dr. Westfried opined that this expectation would interfere with the attorney-client relationship, but it was not "a delusional belief based on psychosis." Despite Defendant's marginal literacy, he "actively participated in tests of cognitive functioning, obtaining average to high average level scores. . . . Overall, he met no criteria for a major mental disorder or a cognitive disorder, but did present himself as a somewhat angry and defensive man."

Having received Dr. Westfried's report, the district court scheduled a preliminary hearing concerning Defendant's competency. The court requested notice from defense counsel whether an evidentiary hearing or additional evaluations were necessary. Before the preliminary hearing, however, Mr. Pori moved for substitution of counsel, citing a complete breakdown in communication. During an in camera session, Mr. Pori explained that the Defendant would not cooperate with him in identifying witnesses for his defense and continually rejected his advice. Instead of substituting new counsel, however, the district court decided to appoint Ms. Ann Steinmetz, who formerly served as a chief federal public defender and a New Mexico state district judge, to review the evidence with Defendant and discuss his options. The hope was that Defendant would warm up to working with Mr. Pori once he had received a second opinion. In order to ensure Defendant's interests concerning the competency evaluation were adequately represented, the district court deferred consideration of Dr. Westfried's evaluation to a later date.

After meeting with Defendant, Ms. Steinmetz reported to the district court that

4

Defendant appeared to understand the nature of the charges against him, was aware of the need to cooperate with his attorney, and was willing to go forward to a jury trial with his present lawyer, Mr. Pori. On April 17, 2007, however, Mr. Pori again requested substitution of counsel and a hearing, asserting that Defendant had asked for his replacement four days earlier and was "unwilling to assist his attorney in any way in the preparation for trial." Appellant's Appendix (App.) Vol. I, at 116. In a hearing two days later, the district court inquired whether appointing a native Spanish-speaking attorney would assist with some of the communication difficulties. (Mr. Pori spoke fluent Spanish but was not a "native" speaker.) Although Mr. Pori continued to express doubts about Defendant's competency, he was agreeable to the idea of additional assistance. The district court appointed Mr. Mario Esparza to assist. Although normally Defendant would not be entitled to more than one court-appointed attorney, the district court authorized both Mr. Pori's and Mr. Esparza's appointment because of the "unique" nature of the case.

On August 1, 2007, just six days before the trial commenced, the district court held a competency hearing. At that time, Defendant's two attorneys agreed with Dr. Westfried's report, and described the issue as a communication problem, not a competency problem.[1] Accordingly, the court entered a finding that Defendant was

---

[1] Specifically, in response to the district court's question whether "counsel disagreed with the [Westfried] report," Mr. Pori informed the court as follows:

(continued...)

5

competent to stand trial. App. Vol. III, at 74. At the competency hearing, it was brought to the court's attention that Defendant had unrealistic expectations regarding the role the confidential informant, Veloz, would play at trial. Defendant wanted Veloz tried as a co-defendant and to sit at the table with him. The district court explained to Defendant that Veloz was a witness, not a defendant, and despite Defendant's preference, Veloz would not sit beside him. The district court also admonished Defendant that he had appointed two "expert defense lawyers" to assist him and that Defendant should listen to their advice. Id. at 87-88.

Defendant's trial began on August 7, 2007 with jury selection. Before the jury convened for opening statements, Defendant's attorneys explained to the district

---

(...continued)

> We don't take issue with Dr. Westfried's report. We do think that, certainly, [Defendant] is able to understand the nature of the charges which are pending against him. Our concern primarily was whether or not he was able to cooperate with his counsel and be able to make meaningful decisions in his defense; . . . particularly concerning his right to testify or his right to remain silent.
>
> I think that, at the end of the day, what we had was more of a personality conflict between [Defendant] and myself. To the extent that I contributed to that conflict, I apologize first to [Defendant] and then to the Court. He certainly does seem to have a rational and factual understanding of the charges and has a present mental ability to consult with his attorney and sufficient intellectual functioning to allow him to assist in the defense of these charges.

App. Vol. III, at 72. Additionally, Mr. Esparza informed the court that Defendant had been assisting him with his defense and that Mr. Esparza's "observation of [Defendant] is that he is very coherent and understands totally the judicial process . . . . So my belief, Your Honor, is that he is competent to stand trial." App. Vol. III, at 73.

6

court that Defendant desired to be excused from the trial until the defense called Veloz to testify. Id. at 240. In order to confirm that Defendant had knowingly, voluntarily, and intelligently waived his right to be present during the proceedings, see Fed. R. Crim P. 43(c)(1), the district court conducted an in camera colloquy with Defendant and his attorneys. The district court informed Defendant that because he was raising an entrapment defense it was important that he be present to prevent the jury from drawing a negative inference from his absence. Id. at 246. The district court also explained that, if Defendant chose to testify, it would be helpful for him to hear the testimony of the witnesses. Id. at 247. After this explanation, Defendant stated he still did not want to be present during the trial unless the "rat" Veloz was present first. Id. at 247.

Displaying considerable patience, the district court attempted to help Defendant understand criminal procedure by analogizing to the rules of soccer—a sport Defendant told the district court he played in the past. The court explained that "one of the rules of the game here in this trial is that the government goes first," and since the government was not calling Veloz in its case-in-chief, Defendant would have to wait until his lawyers presented Defendant's case. Id. at 248-49. In response, Defendant launched into a lengthy diatribe about the injustice of his situation.[2]

---

[2] Defendant stated:

7

Well, what I'm saying is I don't know if that man who I saw 18 months ago, if he's a rat, that was – that man is a rat that which I've been saying for the last 18 months. He's the one who – who trapped me into working with him and got me here. And if that man is the one that I'm asking for, then I don't agree with the Court's moving ahead, because I'm going to be found guilty, and that's an injustice. And in order – I – in order for the Court to continue that man needs to be here and for him and me to – to give testimony. If they're going to hear me they're going to hear him also. . . . That man tricked me. He promised me. He told me. He swore to me on his family that he was going to give me money, and he tricked me, because I don't sell drugs, neither in Orlando, which is where I'm from. I'm not familiar with this town.

And I told him that I couldn't work with him but he insisted, and so he – he brought me here in order to meet those guys who are paying for this case now. And if he brought me here and if the Judge is giving me to understand that he's a rat that the government is paying, then that's not true because he was – I was going to be doing the same money – the same job for money, and he's not going to give me money. The Judge isn't going to pay me. And true legal roots, as I see it, that man needs to be here present so he can be put into prison with me together at the same time. And if not, besides that, I have witnesses in Orlando of ladies that he is pulling a scam on.

And so in order for me to plead guilty that man needs to be here with me for us to go to jail together, because there were four people in this case, and two of them are paying for it already, and two of them are out here, so he needs to be out here to be a witness. And if that man is not brought to me the way the gentlemen are saying that he's going to be brought, as I see it, if the Judge is not letting me speak, then that's abuse. He has all the power, and he is abusing me with it. And so if I am not allowed to speak in the court what is allowed a defense, and so if I am not being allowed to speak, then I'm not being denied my defense.

And so if this is going to be determined now that we're in the home stretch, that man needs to be here to be fair in order for justice to be done with me, because if not, there will be no justice here. This house, outside of it, says this is the house of justice, not that it is the house of injustice. And I'm a man who has a clean record, and I think

(continued...)

8

The district court inquired whether Defendant wanted to remain present during the Government's presentation of the witnesses that afternoon. Defendant responded that he wanted "the rat" there "first," "next to" him. Id. at 255. The district court denied his request. Despite his earlier protests, Defendant remained in the courtroom the rest of the day.

The following morning, the issue of Defendant's presence in the courtroom loomed. In the opening minutes of the day's session, outside the presence of Defendant and the jury, Mr. Pori suggested the district court was "dealing with someone who is either crazy or crazy like a fox." Id. at 329. Mr. Pori explained that

---

[2](...continued)
the Judge knows that, and what they're giving me here is a man who is a criminal, and that's illegal. That's not allowed in any country in the world.

And if here, I'm going to be found guilty by the jury and the prosecutor, who is the leader of saying that I sell – I sold – that I – that I sold the car, which is all they have, that's the only evidence they have, I've seen that's the only evidence they have. And if they're going to try me on these charges – and these gentlemen here won't let me know, I've asked them, and they won't let me know.

And so the way I see it, the only way to try these charges – and that's why I'm asking for this man, for him to testify, because I was the hook and the line and the bait that brought these – these men here, and I did my job well, but because I don't have documents, I'm here in jail and he's out on the street and that's illegal. And that man, as I said, as I said a moment ago, the Judge or I don't know who, offered me the same job but it wasn't – but I didn't get any money for – for it. And they're telling me that that's paid for, and that's not true. That's illegal. I know how the process of being a rat works. I know how that process works.

App. Vol., III, at 240-53.

9

Defendant insisted on only appearing in court if the cooperating informant was seated next to him at counsel table, facing criminal charges. Defendant also insisted on testifying "at the same time" as the informant, similar to the television program *Judge Judy*. Id. at 329. Mr. Pori then raised the concern that Defendant was not just "crazy like a fox," *i.e.*, malingering, but instead was affirmatively demonstrating his incompetence. The district court stated that, in its view, there was no evidence in the record to cast doubt on the initial determination of competency and that Defendant's prior issues with Mr. Pori "were not at all justified," but that the court had appointed Mr. Esparza in an effort to "appease" Defendant. The district court stated that it would not stoop to the level of letting Defendant control the proceedings.[3] The court relented, however, to defense counsel's request to call Veloz earlier, during the Government's case-in-chief, in an effort to appease Defendant's desire to see him testify. At this point the court took a brief recess to have Defendant transferred to the courtroom.

Upon reconvening, the district court explained to Defendant that he was

---

[3] The district court's exact words explaining that Defendant would not be allowed to disrupt the proceedings were, "you don't let the patients run the asylum." Id. at 331. In context, the court clearly did not intend to imply that Defendant was demonstrating he should be *in* a mental asylum. Rather, the district court obviously meant that Defendant could not have his every request catered to. Specifically, the district court would not order the confidential informant to sit at counsel table with Defendant because of the "real potential for . . . witness intimidation." Id. at 331. Perhaps, "you don't let a fox guard the henhouse" would have been a better aphorism to describe the situation.

granting his attorneys' request to call the confidential informant, Veloz, out of order. The district court emphasized, however, that Veloz would not sit beside Defendant because the court viewed that "as a form of witness intimidation," and that Defendant would not be allowed to disrupt the proceedings. Id. at 339. "Why not?" Defendant curtly replied. Id. The district court, again, patiently explained that there were rules governing the presentation of evidence and that, although it understood Defendant was upset that Veloz was not being charged with a crime, the court had no control over the matter. Defendant launched into another tirade about the necessity of Veloz testifying at the same time as Defendant.

At this point Mr. Pori renewed his concern about Defendant's competency, explaining that Defendant had exhibited this sort of behavior for "18 long months." Id. at 343. The district court noted counsel's concern, but observed that "the professional opinion of the evaluator," Dr. Westfried, did not concur and "on that basis" the district court wanted to proceed with the trial. Id. at 343. The district court inquired whether Defendant would like to stay in the courtroom. Defendant answered that, "if what I'm asking for is not going to be done, then I can't." Id. at 344. The district court again remonstrated with Defendant, explaining that his lawyers thought it would be a good idea for him to stay in the courtroom, but that he had the choice to leave. The district court then made a finding that Defendant was voluntarily choosing to remove himself by "insisting on conditions" that would "disrupt the decorum necessary for this proceeding to continue" and that "his

11

actions," based on the court's observations, were "an effort to intimidate the witness'

testimony and keep the witness from testifying." Id. at 351. After this finding, the

court granted Mr. Pori's request for a standing objection as to Defendant's

competency. Id. at 352-53. The trial proceeded in Defendant's absence for the

remainder of the day.

On the morning of the third day of trial, August 9, 2007, defense counsel noted

that, during Defendant's tirade of the previous day, he had stomped his feet on the

floor like a child. Defense counsel requested that the district court again speak

directly to Defendant to assess his competency. The court complied, and an

exchange similar to the court's conversations with Defendant on previous days

occurred, *i.e.*, Defendant expressed anger and frustration and noted his refusal to

cooperate with the proceedings. At this point Mr. Pori suggested he was "probably

wrong" to acquiesce to Dr. Westfried's evaluation and suggested circumstances had

"changed to the point where it may be appropriate to suspend these proceedings

because of the behavior that he's demonstrated even today . . . making the same wild

request with the same st[o]mping of the feet, although it didn't seem as loud today,

but that at that point, we do have some evidence before the Court." Id. at 541. The

district court disagreed, however, stating that it would prefer to send Defendant to

an evaluation before sentencing if the jury returned a guilty verdict.

The following day, August 10, 2007, the jury did indeed return a verdict of

guilty on both counts. After Defendant refused to participate in a pre-sentence

interview with the U.S. Probation Office, his attorneys filed another motion requesting a competency determination. App. Vol. I, at 612.

At a hearing on the motion, the district court quoted at length from Dr. Westfried's evaluation and stated the "difficulty in this case is . . . this is part of [Defendant's] modus operandi in terms of the patterns are consistent from early on when we had a number of hearings." App. Vol. III, at 849. The court noted that there was "certainly some irrational conduct displayed by" Defendant. Id. at 849. The court decided, however, that it would allow Defendant to be sent to an evaluation to determine "that he is mentally competent to be sentenced." Id. at 850. The court noted that, if the "evaluator agrees with Dr. Westfried, then I'm fully satisfied that [Defendant], at all material times, was competent and, therefore, is competent to be sentenced." Id. at 851. The district court entered an order to that effect on November 8, 2007.

The competency evaluation took place over the course of a month at the Federal Correctional Institution in Fort Worth, TX. Dr. Lisa Bellah, a forensic psychologist, evaluated Defendant. Dr. Bellah concluded Defendant was "competent throughout his legal proceedings and is competent to proceed to sentencing." App. Vol. I, at 642. Dr. Bellah acknowledged that Defendant "may have anger management problems stemming from a possible mental health diagnosis." Id. But "upon further review of his history and behavior over a one month time frame, there is insufficient evidence to suggest a formal mental health diagnosis is present." Id.

13

Dr. Bellah concluded that Defendant's "suspiciousness and distrust does not appear to be delusional in nature, but rather, a characterological aspect of his overall personality structure." Id. The report noted that Defendant had the "capacity to comport his behavior in an adequate manner, but chooses to behav[e] in a negative manner in order to control his environment." Id. Indeed, Dr. Bellah predicted that Defendant would "likely continue to be a difficult client, but his behavior does not appear to stem from the direct effects of a mental disease or defect." Id.

At sentencing, Defendant's attorneys stated that his suspiciousness and distrust made Defendant incapable of assisting in his defense, and thus incompetent throughout the proceedings. Defendant's attorneys did not, however, request further evaluation prior to sentencing. The district court concluded Defendant was competent, based on the two competency evaluations by licensed professionals and the court's own observations of Defendant. App. Vol. III, at 859. The district court also observed that Defendant's personality made him a difficult client, and that he had chosen not to work with his attorneys. The district court sentenced Defendant to 78 months in prison, the higher end of the Guidelines sentence. Defendant appeals.

## II.

The Supreme Court established the Constitutional standard governing competence in Dusky v. United States, 362 U.S. 402 (1960) (per curiam). "Dusky

14

defines the competency standard as including both (1) 'whether' the defendant has 'a rational as well as factual understanding of the proceedings against him' and (2) whether the defendant 'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding.'" Indiana v. Edwards, 128 S.Ct. 2379, 2383 (2008).

"[C]ompetency claims can raise issues of both substantive and procedural due process." Walker v. Att'y Gen., 167 F.3d 1339, 1343 (10th Cir. 1999). Defendant raises both procedural and substantive claims here. He contends (1) the district court violated his right to procedural due process by "repeatedly fail[ing] to conduct an adequate inquiry into [Defendant's] competence during the jury trial," and (2) the district court violated his substantive right to be free from criminal prosecution while incompetent. Because "an individual raising a procedural competency claim is held to a lower burden of proof than one raising a substantive competency claim," we consider the procedural claim first. McGregor v. Gibson, 248 F.3d 946, 952 (10th Cir. 2001) (en banc).

## A.

"A procedural competency claim is based upon a trial court's alleged failure to hold a competency hearing, or an adequate competency hearing." Id. In Pate v. Robinson, 383 U.S. 375, 384-85 (1966), the Supreme Court recognized a procedural right to a competency hearing in state prosecutions, based on the due process clause

15

of the Fourteenth Amendment.  See U.S. Const. amend. 14, § 1 (prohibiting state deprivation of "life, liberty, or property, without due process of law").  Neither party to this appeal has suggested that, in a federal criminal prosecution, the Fifth Amendment's due process clause would not provide the same protection.  See id. amend. 5.

Pate recognized that the Illinois state court could have satisfied due process merely by "carrying out the terms of the State's own statute which required 'a sanity hearing where the evidence raised a bona fide doubt' as to the defendant's competence to stand trial."  United States v. Knohl, 379 F.2d 427, 435 (2d Cir. 1967).  In federal court, however, a statutory procedure exists to protect the procedural due process rights of criminal defendants.  In pertinent part, 18 U.S.C. § 4241(a) provides:

> [T]he defendant or the attorney for the Government may file a motion for a hearing to determine the mental competency of the defendant. The court shall grant the motion, or shall order such a hearing on its own motion, *if there is reasonable cause* to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense.

(emphasis added); see also United States v. Swanson, 572 F.2d 523, 526 (5th Cir. 1978) (holding that the § 4241's precursor "enforces the due process requirement" identified in Pate); Knohl, 379 F.2d at 435 (noting § 4241's precursor "was not enacted in contravention of due process but in aid of it").  As relevant here, § 4241

16

applies "after the commencement of a prosecution for an offense and prior to the sentencing of the defendant." 18 U.S.C. § 4241(a). Thus, Defendant's procedural claim falls squarely within the parameters of the statute.

Defendant has not argued that satisfying § 4241's procedural requirements would fall short of meeting his procedural due process rights. There is good reason to believe that Congress envisioned § 4241 as embodying at least as much procedural protection as the standard described in Pate. The Senate Judiciary Report to the Comprehensive Crime Control Act of 1984 cited to Pate in noting that "all the procedures included in [§ 4241] are for the benefit of the defendant." S. Rept. No. 98-473, at 235 (1984), as reprinted in 1984 U.S.C.C.A.N. 3417. Additionally, the "bona fide doubt" standard discussed in Pate is very similar to the language in § 4241. Pate expresses the standard in the negative, requiring a competency hearing if "the evidence raises a '*bona fide doubt*' as to a defendant's competence," 383 U.S. at 385 (emphasis added), while § 4241 expresses the standard in the positive, requiring a competency hearing "if there is *reasonable cause to believe* that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent." 18 U.S.C. § 4241(a) (emphasis added); see also Chavez v. United States, 656 F.2d 512, 516 n.1 (9th Cir. 1981) (discussing different formulations of the bona fide doubt standard and concluding that "all describe the same constitutional standard").

Finally, in evaluating § 4241's precursor, the Second Circuit observed that

17

Pate "did not create any new federal right or a new procedure for applying for a hearing in the federal courts on the issue of mental competency to stand trial" that was not already protected by the federal statute. Knohl, 379 F.2d at 435. We agree with this analysis for purposes of this case. Seeing no need to distinguish between the procedural protections identified in Pate and § 4241, we, therefore, apply § 4241 to determine whether the district court erred in failing to hold a second competency hearing during trial.

## B.

Defendant, citing cases from two of our sister circuits, suggests that our standard of review is "comprehensive" or "plenary" for a procedural competency inquiry. See United States v. Ross, 510 F.3d 702, 712 (7th Cir. 2007); United States v. Jones, 336 F.3d 245, 256 (3d Cir. 2003). We disagree. Ross merely held that, where a district court "did not order a psychiatric examination or make a judicial determination regarding the defendant's competence," appellate review is "comprehensive." Ross, 510 F.3d at 712. Similarly, in Jones the district court "did not hold a formal hearing" concerning the defendant's competency. Jones, 336 F.3d at 257. That was not the case here. The district court in this case ordered an initial psychiatric examination, provided counsel with an opportunity to supplement the record prior to trial, and entered a finding of competency at a hearing just a few days before trial. Our precedent is clear that "whether to order a second competency exam is a matter wholly within the sound discretion of the trial court." United States

18

v. Prince, 938 F.2d 1092, 1095 (10th Cir. 1991); see also United States v. Ramirez, 304 F.3d 1033, 1035 (10th Cir. 2002) ("Whether to order a competency examination is reviewed for an abuse of discretion.").[4]

Given that "a defendant's behavior and demeanor at trial are relevant as to the ultimate decision of competency," we stress that the observations and conclusions of the district court observing that behavior and demeanor are crucial to any proper evaluation of a cold appellate record. Prince, 938 F.2d at 1095; see also United States v. Pompey, 264 F.3d 1176, 1179 (10th Cir. 2001) (holding the district court "may rely on a number of factors, including . . . the court's observations of the defendant's comportment"). Indeed, implicitly recognizing the importance of the district court's vantage point in a competency inquiry, several of our sister circuits also apply an abuse of discretion standard.[5]

---

[4] We have identified at least one exception to applying the abuse of discretion standard, i.e., "when a criminal defendant's competency was determined under an unconstitutional burden of proof." McGregor v. Gibson, 248 F.3d 946, 955 (10th Cir. 2001) (en banc). In such cases "the prior competency determination merits no presumption of correctness" and we will evaluate whether "a reasonable judge should have had a bona fide doubt as to his competence at the time of trial." Id. at 955.

[5] See, e.g., United States v. Ewing, 494 F.3d 607, 622 (7th Cir. 2007) ("A district court's decision whether to hold a competency hearing is discretionary and reviewed deferentially"); United States v. Nickels, 324 F.3d 1250, 1251 (11th Cir. 2003) (per curiam) ("We review the denial of a § 4241 motion for an abuse of discretion"); United States v. General, 278 F.3d 389, 396 (4th Cir. 2002) ("Whether reasonable cause exists [to doubt defendant's competency] is a question left to the discretion of the district court."); United States v. George, 85 F.3d 1433, 1437 (9th Cir. 1996) (holding § 4241's "language . . . indicates that we should review a district
(continued...)

19

Other non-comprehensive factors relevant to the need for a competency hearing include "evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial." Drope v. Missouri, 420 U.S. 162, 180 (1975). "[A]n attorney's representation about his client's competency" is another factor that may be considered. Jones, 336 F.3d at 256 (internal quotation omitted). But we emphasize that there are "no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated." Drope, 420 U.S. at 180.

## C.

Having reviewed the record in light of the above factors, we cannot say the district court abused its discretion. We believe that a reasonable judge, situated in the same position as the district court here, would find insufficient cause to believe Defendant's competence was compromised. Defendant's behavior during trial was consistent with Dr. Westfried's psychological evaluation and his attorneys' pre-trial experience, *i.e.*, Defendant was a difficult client, highly suspicious of his lawyers, but ultimately, as Dr. Westfried concluded, "there were no signs of his having

---

[5](...continued)
court's decision to deny an examination for abuse of discretion"); United States v. Vamos, 797 F.2d 1146, 1150 (2d Cir. 1986) ("Determination of whether there is 'reasonable cause' to believe a defendant may be incompetent rests in the discretion of the district court.").

compromised competence related capacities." Defendant's attorneys had concurred, as soon as six days prior to trial, that Defendant was competent.

Indeed, the district court went out of its way prior to trial to ensure that Defendant received adequate counsel from as many as three attorneys, all of whom the district court viewed as highly experienced and capable of vigorously representing Defendant's interests. Although one of Defendant's attorneys, Mr. Pori, expressed concern about Defendant's competency during the months preceding trial, it was not an abuse of discretion for the district court, in the heat of trial, to weigh the psychological evaluation more heavily given Mr. Pori's and Mr. Esparza's assurances that Defendant was competent the week before trial, and Ms. Steinmetz's concurring report a few months prior. In fact, we believe the district court was eminently reasonable in doing so. See United States v. Mackovich, 209 F.3d 1227, 1233 (10th Cir. 2000) ("[T]he concerns of counsel alone are insufficient to establish doubt of a defendant's competency.").

To be sure, certain extreme behavioral manifestations may, along with other factors, raise reasonable cause to doubt a defendant's competency. For example, in United States v. Williams, 113 F.3d 1155 (10th Cir. 1997), we held that the defendant's "irrational behavior," "outbursts," and "hysteria" during trial gave rise to a "bona fide doubt" about her competence, and that the district court violated procedural due process by not holding an evidentiary hearing under the circumstances. Id. at 1160. But this case bears important differences from Williams.

21

First, the district court in <u>Williams</u> never ordered a pre-trial psychological evaluation, and thus we undertook a "comprehensive" review. <u>See</u> <u>id.</u> at 1160 ("[W]ith no competency determination before us, our review is . . . comprehensive."). Here, we apply a more deferential standard to the district court's decision to forego a second competency hearing after a prior psychological evaluation and finding of competency.

Second, in <u>Williams</u>, the defendant was taking a psychotropic drug and gave a "cryptic[]" response to the district court's inquiry whether "it interfered with her ability to communicate with her attorney." <u>Id.</u> at 1160. During trial, the defendant informed the court that she had not taken her medication, but the district court "made no further inquiry," even when the defendant's testimony spiraled into incoherency. <u>Id.</u> at 1158. Here, Defendant was neither prescribed, nor failed to take, such mind-altering medication.

Finally, even reviewing a cold appellate record, Defendant's behavior here bears little resemblance to that of the defendant in <u>Williams</u>. In <u>Williams</u>, the defendant wept uncontrollably during trial, prompting us to editorialize that "[t]o say [the defendant] was out of control during the second day of the proceeding euphemizes the record." <u>Id.</u> Here, Defendant's tirades reflect anger and frustration, but they are not incoherent. Defendant's behavior was quite consistent with Dr. Westfried's evaluation, and the district court acted reasonably in taking the psychological evaluation into consideration when evaluating Defendant's conduct.

22

See United States v. Jones, 23 F.3d 1307, 1309 (8th Cir. 1994) ("The psychiatric report submitted to the court indicated that [the defendant] was competent to stand trial. Under those circumstances, the trial court had the discretion to hold or to forgo an additional hearing on [the defendant's] competency.").

In sum, the district court did not abuse its discretion in failing to order a second competency evaluation or hearing, despite Defendant's behavior at trial. Under this record, the district court reasonably concluded that (1) Defendant had the capacity and ability to understand the charges against him and to assist in his defense, and (2) the Defendant's behavior was merely an attempt to disrupt the proceedings. See Drope, 420 U.S. 171 (defining competency in terms of "capacity"); Dusky, 362 U.S. at 402 (defining competency in terms of "present ability"). Accordingly, we reject Defendant's procedural competency challenge.[6]

D.

Defendant also raises a substantive due process challenge to the district court's competency finding. "[A] substantive competency claim is founded on the allegation

---

[6] Defendant relies on other cases as well, but they do not bear any resemblance to the facts presented here. See, e.g., Drope, 420 U.S. at 165-68 (psychiatric report indicated mental disease, defendant's wife testified her husband subjected her to bizarre physical and sexual assault and that he was sick, and defendant shot himself during the trial); Pate, 383 U.S. at 378-80 (four witnesses testified defendant was insane and described history of disturbed behavior, medical records confirmed defendant had been committed and that he suffered from hallucinations and possibly schizophrenia, and defendant had periods of irrational and violent behavior).

23

that an individual was tried and convicted while, in fact, incompetent." McGregor, 248 F.3d at 952. But Defendant's failure to succeed on his procedural competency claim also forecloses Defendant's substantive challenge. See United States v. Herrera, 481 F.3d 1266, 1272 n.1 (10th Cir. 2007) ("Since we conclude no bona fide doubt exists that [the defendant] was not incompetent at trial, he likewise fails to make a substantive due process claim."). Where a petitioner cannot show a bona fide doubt as to his competency, "he cannot meet the more stringent substantive due process competency standard." Walker v. Gibson, 228 F.3d 1217, 1230 (10th Cir. 2000), abrogated on other grounds by Neill v. Gibson, 278 F.3d 1044 (10th Cir. 2001). Were we to reach the merits of Defendant's substantive competency claim, we would conclude, for the reasons already discussed, that the district court's finding was not clearly erroneous. See United States v. Boigegrain, 155 F.3d 1181, 1189 (10th Cir. 1998) (holding that a district court may "rely on a number of factors, including medical opinion and the court's observation of the defendant's comportment" in "making a determination of competency"); see also Mackovich, 209 F.3d at 1232 (holding that the district court's "reliance" on "the only medical expert who assessed [the defendant's] competence" was "not clear error").

AFFIRMED.